Filed 3/30/15  P. v. Aguon CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL JAY AGUON et al.,<br><br>    Defendants and Appellants. | D064367<br><br><br><br>(Super. Ct. No. SCD233469) |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant Michael Jay Aguon.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant Rafael Meraz.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Stephanie H. Chow, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Michael Jay Aguon and Rafael Meraz of first degree murder (Pen. Code,[1] §187, subd. (a).) The jury found Meraz was a principal and a principal in the murder personally used a firearm and proximately caused great bodily injury, within the meaning of section 12022.52, subdivisions (d) and (e)(1). It also found with respect to Aguon that a principal in the offense was armed with and used a firearm (§12022.53, subds. (d), (e)) and Aguon personally used a firearm (§12022.53, subd. (d)). In addition, the jury found that Meraz and Aguon acted for the benefit of a criminal street gang, within the meaning of section 186.22, subdivision (b).

The court sentenced Aguon to prison for 25 years to life for the murder and a consecutive 25 years to life for the personal firearm use.

The court sentenced Meraz to prison for 25 years to life for the murder and a consecutive 25 years to life for the weapons allegations. Before trial, Meraz pled guilty to felon in possession of a firearm, possession of a loaded firearm, and felon in possession of ammunition. (Former §§ 12031, subd. (a)(1); 12021, subd. (e); 12316, subd. (b)(1).) Therefore, at the sentencing hearing, the court imposed on Meraz a concurrent three years for the felon in possession of a firearm count, and stayed the sentence under section 654 for possession of ammunition and possession of a loaded firearm counts.

Aguon appeals, contending (1) his verdict must be reduced to second degree murder under section 1157 and (2) the prosecutor committed misconduct during closing argument. He also maintains the abstract of judgment must be corrected.

---

[1] Statutory references are to the Penal Code unless otherwise specified.

Meraz appeals, arguing the trial court improperly allowed unnecessary, prejudicial, and cumulative gang evidence to be admitted, and his sentence violates the Eighth Amendment.

Both Aguon and Meraz join in each other's arguments.

We agree with Aguon that the abstract of judgment should be corrected. We conclude the remaining issues are without merit, and thus, affirm the judgment, but remand the matter back to the superior court to correct the abstract of judgment.

FACTUAL BACKGROUND

Prosecution

On October 21, 2007, Victor Balderas and Jimmy Parker were hanging out in front of Freese Elementary School in Lomita Village, talking to some girls. Meraz rode up on a bicycle, throwing gang hand signs as he approached. He asked the group if it was from "Pussy Hills," a derogatory term for Lomita Village gang rivals Paradise Hills. He said he was "Grims" from "Lomita." He talked to them as if they were gang members, but when they told him they did not "bang," and were not disrespecting him, he said, "Cool," and left. He appeared to be either drunk or high.

Robert Carranza joined the group, and Balderas told him what had just happened. At that time, Meraz rode his bike back to the group and said something about blasting them. He repeated his comments about "Pussy Hills." He gave Carranza an overly firm handshake or overly aggressive fist bump. He asked if they wanted to get "blasted." He pulled away his jacket to reveal a gun in his waistband. Then he rode away.

3

Balderas and Carranza decided to go hang out instead at the Balderas house, which was just down the street. About an hour and a half later, they, along with other Balderas family members including Vidal "Junior" Balderas (Vidal), were hanging out in front of the house listening to an oldies music show on the radio. Meraz rode up on his bicycle flashing gang hand signs in time to the music. Vidal confronted him, asking him why he was disrespecting the household. Meraz explained that this was Lomita Village, and he was Grims. Vidal said they did not bang at that house. Meraz kept saying this was "their" neighborhood. Vidal told him to leave. Meraz lifted up his shirt, revealing his gun, and started to advance on Vidal.

Carranza sprang forward and punched Meraz in the face, knocking him to the concrete. Meraz pulled his gun out as Carranza held him down. Carranza kept hitting him. Vidal eventually pried the gun from Meraz's hands. He told Meraz, "You're going to stay right here, homie and wait for the police." He lectured Meraz about disrespecting his family. He told Meraz that if the older homies in Lomita Village had taught him to disrespect nongang houses, then they had taught him wrong. He said he was going to talk to the older homies and that they would set Meraz straight.

Vidal's sister, Wendy Balderas, called 911. In the call, Vidal and Meraz can be heard in the background. Vidal chastised Meraz for coming around and "disrespecting" with a gun, and saying, "I don't care homes, we don't care about the neighborhood, homes. I don't care about your neighborhood." Meraz responded, "I'm gonna fuck it up homie."

4

Meraz got cut when he hit the concrete. The police took him to the hospital, where he denied drug or alcohol use, but tested at a 0.13 percent blood alcohol level. He had scalp lacerations that required staples to close, and a fractured thumb. The police recovered the gun, which was loaded with 11 rounds.

Ten days later, Vidal was killed in front of the Balderas house after returning from trick-or-treating with his four-year-old daughter. There were three assailants. Vidal struggled with one at the entrance to the yard and was shot. The men started running away, and Vidal took a few steps after them, but then fell face down on the ground. Vidal suffered six gunshot wounds, two through the heart. Just before the shooting, one of the assailants said, "What's up now."

The shooter was wearing a black hoody, with a bandana covering his face. One of the others had a mask similar to what the villain wore in the movie *Scream*. One had a skull mask. There were no shell casings at the scene, which suggested that the weapon fired was a revolver. All the bullets recovered at the scene were fired from the same gun.

Some children trick-or-treating in the neighborhood heard gunshots and a woman scream and saw the men run away. The men were masked, one with a Scream mask, another with a skull mask, and one with a bandana. One of the men was holding a rifle. As the men went by them, they asked what had happened. The man holding the rifle turned and stared at them, but one of his companions said, in Spanish, "Hey, dude. Calm down. Don't do anything. We finished."

Shortly after the shooting, a gang suppression detective arrested Mauricio Montiel for a curfew violation near Meraz's house. Montiel had bullets and a loaded speed loader for a revolver in a nylon bag in his pocket. He said he was coming from a friend's house and had found the items on the ground. His cell phone reflected a call at 10:15 p.m. that night to "Grims" at Meraz's home number. The cartridges in the speed loader in Montiel's pocket were .38 specials, consistent with the spent bullets recovered from the scene.

Police searched Meraz's house a few hours after the shooting and found a skull mask under some jeans. The mask had Meraz's DNA on it. They found a black bandana halfway under a bed. They found a pair of pants in a bedroom with a paper bearing the name "Mikey" as well as Meraz's telephone number in the pocket.

Subsequent testing detected several gunshot residue particles (one "characteristic" and several "consistent") in the fabric of the pants. A black hooded windbreaker had several "consistent" gunshot residue particles.

Meraz claimed he had not left the house that day since coming home from school. He maintained this story even when confronted with the fact his brother and mother had told police he had been out of the house that evening. His brother told police that Meraz came home about 8:00 p.m. or 8:30 p.m. that night, changed out of his clothes right away, and took a shower.

Meraz admitted, however, that Montiel had been at his house that night.

Elizabeth Hiday was Kirk Borja's ex-wife. Both she and Borja were Lomita Village gang members. Three days after the shooting, Borja asked Hiday to drive him to Aguon's

6

house.  She did, and once there, encountered Aguon and his cousin Benny Tejeda, also a Lomitas Village gang member.  Aguon and Tejeda lived in the same house.

Borja asked, "What happened?" and Tejeda slapped Aguon on the back of the head, saying, "This fool did the wrong job—This fool didn't even do the job right.  He got the wrong brother."  Hiday asked if Tejeda meant Vidal, and he said "Yes."  Aguon then told how about a week earlier, another homeboy had gone to confront Balderas about being from Paradise Hills, but Victor's older brother, Vidal, had beaten him and taken his gun.  Aguon then said that he and two other guys had gone to the Balderas house on Halloween.  They had a Scream mask.  They got into a fight with Vidal when he blocked them from getting into the house.  There had been two gunshots, and Vidal had kept fighting.  After two more gunshots, Vidal dropped. Aguon and the others took off running.

While telling this story to Hiday and Borja, Aguon was, in Hiday's words, "cocky" and "giggling."  She found his attitude offensive because she was friends with Vidal's brother.

Hiday had been a paid police informant for some time, and had used her payments to support her drug habit.  She had stopped using drugs and committing crimes in 2007, a few months before the shooting, and had gotten a job with an organization called "Second Chance."  She was not paid for the information she gave about Vidal's murder, and the police promised her she would never have to testify.  Nevertheless, several years after providing the information, with her life finally straightened out, she was told she was going to have to testify at trial.  She had to leave her job at Second Chance and be relocated in the witness protection program.

7

Hiday had thought Aguon's surname was Tejeda, since he lived with Benny Tejeda. Police checked their records for a "Mikey Tejeda," but came up with nothing. The police appear to have let the matter drop until reopening the case in 2010 when Aguon was arrested.

While in jail in 2011, Aguon learned it was Hiday who had told the police about his involvement in Vidal's murder, and he called home to instruct his cousin Benny to deny to investigators that any such conversation had ever happened. Benny was not home, so he told Benny's brother, "I was just gonna tell your brother . . . I talked to my attorney . . . today, and, and he's giving—gave me the lay-down, . . . what's going on . . . . I was gonna have that fool go and talk to you guys or something, and then see (unin)— you know what I mean?" "But I don't think he's gonna go. I think he's probably send somebody else. Like an investigator . . . ." He continued, "my attorney says some of the stuff that, uh, that whoever's saying that shit . . . That some of that stuff . . . supposedly it happened in front of the house, and [Vidal] was there. You know what I mean? And, and that should never even happened . . . That's wh—that's why I was like—I was gonna tell [Vidal], like, 'Man, that's some bullshit,' you know?" "Yeah, . . . they're saying that— saying that was said in front of the house and he—[Vidal] was there . . . ." "If anything, uh, like, uh, if anything I could just be like, 'Man, you could even ask my cousin, you know?' " He continued, "Yeah, make sure that fool knows . . . That fucking shit's some bullshit. . . . Never even happened. . . . You know what I mean? That mean I'm in here for nothin' and shit. Alright."

8

San Diego Police Department Detective Damon Sherman testified as the People's expert on the Lomita Village gang. According to Sherman, Lomita Village has all the characteristics required by the Penal Code for a criminal street gang. In Sherman's opinion, Meraz, known as Grims, was a Lomita Village gang member at the time of the shooting. Sherman also opined Aguon, known as "Villen," was a Lomita Village gang member in 2007.

In hypotheticals mirroring the facts of the case, Sherman opined as follows: If a gang member had his gun taken and was beaten so badly he had to go to the hospital, and the gun was given to law enforcement, that was an act of disrespect which, in gang culture, required a retaliatory act using greater force and power to inflict a much greater injury. Sherman further opined the shooting, if committed by multiple Lomita Village gang members, was committed in association with Lomita Village and benefited that gang. It repositioned the gang and the disrespected gang member in the gang community and reinstilled fear in the civilian community. If the phrase, "what's up now" was said at the time of the shooting, this demonstrated the disrespected person's affirmation that he had won in the long run. In Sherman's opinion, if there were statements after the shooting, such as "we're finished now," they showed the job was completed as planned.

Defense

Aguon's defense at trial was denial. He presented alibi witnesses. He also attempted to impeach Hiday, by offering evidence Hiday was familiar with the justice system. She had multiple felony convictions. Following a conviction in 2005, she began working as a confidential informant for both the Chula Vista and National City Police Departments. As a

9

result of her efforts, she was given a probationary sentence. She violated the terms of probation with a series of check forgeries and began working with a deputy district attorney. She agreed to do a training video in exchange for summary probation and continued to work as an informant. During this time, Hiday was a drug addict and spent her informant compensation on drugs. She did not pay any of the considerable restitution owed in any of her cases. In 2007, Hiday got sober and started working at a nonprofit organization. She worked there until her relocation. Since her relocation, Hiday has maintained employment, but the income does not cover her monthly expenses. The district attorney's office originally paid approximately $44,000 in relocation fees and, at the time of trial, paid her rent, food and utilities and gave her an additional monthly stipend of $975.

Meraz's defense at trial was that the prosecution failed to prove its case.

## DISCUSSION

### I

*THE VERDICT FORMS*

Count 1 of the amended information charged that "[Meraz and Aguon] did unlawfully murder VIDAL BALDERAS, a human being, in violation of PENAL CODE SECTION 187(a)." The prosecution proceeded on a theory the homicide constituted murder in the first degree based on premeditation and deliberation. The jury was so instructed. The trial court also instructed the jury on second degree murder.

Consistent with the instructions, the jury was provided with two verdict forms. One gave the jury the option to return a verdict of first degree murder. The second allowed the jury to return a second degree murder verdict. Each respective form either identified the

10

verdict as first degree murder or second degree murder "as charged in Count One of the Information."

The verdict returned by the jury stated the following in relevant part: "We, the jury, . . . find [Aguon] Guilty of the crime of FIRST DEGREE MURDER, in violation of Penal Code section 187(a), as charged in Count One of the Information."

Appellants now contend that, because the information was silent as to the degree and the jury was not asked to return, and did not return, any specific finding on the truth of the allegation of premeditation and deliberation, the language of the verdict forms was "insufficient to satisfy the requirement of degree specificity in section 1157 and, therefore, the homicide verdict must be fixed in the second degree by operation of law." We disagree.

This precise issue was addressed by the Fifth District in *People v. Jones* (2014) 230 Cal.App.4th 373 (*Jones*). In *Jones*, the subject verdict was substantially similar to the two at issue here. The verdict in *Jones* stated the jury convicted the defendant of first degree murder as "charged in Count One of the Information . . . ." (*Id.* at p. 376.) The information in *Jones*, like the information here, did not specify murder in the first degree. (*Ibid*.) The defendant argued " 'the jury failed to determine the degree of the crime as required by section 1157. Therefore, the verdict must be fixed as murder in the second degree.' " (*Jones, supra*, at p. 376.)

The court disagreed, noting: "Section 1157's requirement that the degree be specified 'may be satisfied in two ways: (1) by a finding that specifically refers to the degree of the crime by its statutory numerical designation; and (2) by findings that encompass the statutory factual predicates of the degree of the crime. [Citation.]' [Citation.] In the present

11

case, the jury's verdict explicitly specified a finding of first degree murder.  Section 1157's requirement thus was satisfied."  (*Jones, supra*, 230 Cal.App.4th at p. 377.)

We agree with the Fifth District in *Jones* and determine that the verdicts here did not run afoul of section 1157.  "That the verdict[s] referred to the crime 'as charged in . . . the Information,' and the information merely charged generic murder without specifying the degree thereof, does not change this, nor does the fact there was no separate finding as to degree."  (*Jones, supra*, 230 Cal.App.4th at p. 377.)

By enacting section 1157, "[t]he Legislature has required an express finding on the degree of the crime to protect the defendant from the risk that the degree of the crime could be increased after the judgment."  (*People v. Goodwin* (1988) 202 Cal.App.3d 940, 947.)  We find no such chance here.  "Section 1157 requires that the jury find the degree of the crime and explicitly specify that degree in the verdict form."  (*Jones, supra*, 230 Cal.App.4th at p. 378.)  The verdict for Aguon and the verdict for Meraz expressly stated a finding of first degree murder.  In other words, the jury's intent to convict Appellants of first degree murder was abundantly clear.

Under the circumstances, each verdict form's reference to the information created no fatal uncertainty or ambiguity, and did not result in a legal impossibility.  Because the degree of the crime was explicitly stated, Appellants' substantial rights were not prejudiced.  Appellants are not entitled to have their convictions reduced to second degree murder.  (See *Jones, supra*, 230 Cal.App.4th at p. 379.)

12

## II

### *PROSECUTORIAL MISCONDUCT*

Appellants contend the prosecution committed prejudicial misconduct during closing argument by diluting the meaning of proof beyond a reasonable doubt.  We disagree.

### A.  Background

During closing argument, the prosecution discussed reasonable doubt.  He did so while showing the jury an exhibit containing the text of CALCRIM No. 220:  "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.  The evidence need not eliminate all possible doubt . . . because everything in life is open to some possible or imaginary doubt."

In discussing reasonable doubt, the prosecutor said:

> "What is reasonable doubt?  Well, it's an abiding conviction.  [¶]  The law is—defines it in this way. Says if it leaves you with an abiding conviction that the charge is true—it doesn't need to eliminate all possible doubt, cause everything in life is open to possible doubt.

> "Your job is not to go back and start speculating or guessing or thinking about possibilities.  It's to use your common sense, use all the evidence that's presented and come to a conclusion that leaves you with that abiding conviction.

> "This is the way I describe it. At some point after you've convicted Grims and Villen of this crime, you're going to go back to your lives. People are going to ask you:  You were on jury service.  You were on jury duty.  What was that case about?

> "You're going to tell them it was a murder.  It was a gang murder.  It was a retaliation murder.

13

"It's when you're talking to them about everything that you witnessed in this case that you're still going to have the abiding conviction deep inside you. You're going to tell them about all the evidence that you heard.

"They're going to say: Well, what was the case about? [¶] You tell them it was a gang retaliation killing. A family had been confronted by a gang member in front of their house . . . . [¶] What happened? [¶] Talk to them about the 911 call, about the witnesses who came in, testified about Grims banging Lomita. . . . [¶] Tell them about this violent criminal street gang . . . [¶] Tell them about the 911 call that captured it all, that you had no doubt as to what happened on October 21. [¶] Tell them about the DNA that was on the gun, about how Grims lied about even having that gun. [¶] And tell them how Vidal Balderas, the guy who was chastising Grims . . . . how you could hear his voice . . . on that 911 call.

"They're going to say: Well, what happened? [¶] Tell them ten days later the defendants came back and they murdered him. [¶] They're going to ask why. [¶] Explain to them all the gang evidence . . . [¶] Talk about the fact that . . . all the witnesses . . . described basically three men in this group: Skeleton, Scream, [and] Bandanna. [¶] They found the skeleton mask inside Grims' house that had his DNA on it. He couldn't buy his way out of that one. [¶] Talk to them about how he said he was home from 1:30 on, but we didn't believe a word that he said because his brother, he came in and actually told us the truth; said that he got home right after the murder, went to his room, changes his clothes, took a shower.

"Talk about the poofy jacket, the black jeans that had the Mikey note inside of them, each with Grims' DNA on it.

"Talk about the calculator that was the lineup and that the person who was out of custody . . . admitted going and doing the shooting with two of his homies. [¶] Talk about why you believed Elizabeth Hiday, why you knew that she didn't have a motive to lie. [¶] As you're telling this story to the person, you're still going to feel that abiding conviction because you're going to know that it's the truth. [¶] That's what beyond a reasonable doubt is."

14

Aguon's trial counsel objected to the prosecution's closing argument, claiming he was "watering down the reasonable doubt instruction" and committing prosecutorial misconduct. The court overruled the objection, stating that it believed the prosecution was merely summarizing the evidence.

In his rebuttal closing argument, the prosecutor reiterated:

> "You will have that abiding conviction when you're telling your neighbor, your sister, your brother, your mother, whoever it is, your employer who hasn't seen you in a month exactly why you held them accountable, exactly why you found them guilty of first degree murder."

Aguon's attorney did not object to anything in the rebuttal closing argument.

## B. Analysis

As a threshold matter, the People argue Appellants forfeited their challenge to the closing argument by failing to object at trial. The record does not support the People's position. Aguon's counsel clearly objected to the prosecutor's closing argument on the same grounds that he raises here. His argument was not forfeited, and thus, we address Appellants' contention on the merits.

Here, Appellants insist the prosecutor told jurors that an abiding conviction was akin to the emotional comfort jurors had in discussions in their daily lives. They maintain that the prosecutor's argument had the effect of lowering the burden of proof. To support their position, Appellants rely principally on two cases: *People v. Nguyen* (1995) 40 Cal.App.4th 28 (*Nguyen*) and *People v. Johnson* (2004) 119 Cal.App.4th 976 (*Johnson*). We find these authorities distinguishable.

15

In *Nguyen*, the prosecutor made the following statements to the jury during summation: " 'The standard is reasonable doubt. That is the standard in every single criminal case. And the jails and prisons are full, ladies and gentlemen. [¶] It's a very reachable standard that you use every day in your lives when you make important decisions, decisions about whether you want to get married, decisions that take your life at stake when you change lanes as you're driving. If you have reasonable doubt that you're going to get in a car accident, you don't change lanes. [¶] So it's a standard that you apply in your life. It's a very high standard. And read that instruction, too. I won't paraphrase it because it's a very difficult instruction, but it's not an unattainable standard. It's the standard in every single criminal case.' " (*Nguyen, supra*, 40 Cal.App.4th at p. 35.)

The court in *Nguyen* held that the prosecutor's argument was improper and "strongly disapprove[d] of arguments suggesting the reasonable doubt standard is used in daily life to decide such questions as whether to change lanes or marry." (*Nguyen, supra*, 40 Cal.App.4th at p. 36.) The court further held that the improper argument was harmless because the prosecutor directed the jury to read the reasonable doubt instruction and the jury was correctly instructed on the standard. (*Id.* at pp. 36-37.)

In *Johnson, supra*, 119 Cal.App.4th 976, the trial court discussed the reasonable doubt standard in questioning prospective jurors. In doing so, the "court equated proof beyond a reasonable doubt to everyday decisionmaking in a juror's life." (*Johnson, supra*, 119 Cal.App.4th at p. 980.) For example, the court told the jurors "that jurors who find an accused person guilty or not guilty engage in the same decisionmaking process they 'use every day. When you get out of bed, you make those same decisions.' " (*Id*. at p. 983.) In

16

closing argument, "the prosecutor took his cue from the court's reasonable doubt instructions, characterized a juror who could return a guilty verdict without 'some doubt' about Johnson's guilt as 'brain dead,' and equated proof beyond a reasonable doubt to everyday decisionmaking in a juror's life: [¶] 'As Judge Oberholzer explained to you even with yourself, the things that you've done in your own life, there has always been, at the minimum, some kind of bit of doubt in the back of your mind about whether or not what you're doing is right or wrong. Even though you felt really strongly about it, there is still kind of lingering doubt. That's always going to be there.' " (*Ibid.*) The trial court instructed the jury with CALJIC No. 2.90.[2]

The Court of Appeal held that "the court's tinkering with the statutory definition of reasonable doubt, no matter how well intentioned, lowered the prosecution's burden of proof below the due process requirement of proof beyond a reasonable doubt." (*Johnson*, *supra*, 119 Cal.App.4th at p. 985.) The court concluded that the improper description of the burden of proof constituted structural error and was reversible per se. (*Id*. at p. 986.)

---

[2]    As set forth in *Johnson*, CALJIC No. 2.90 read: " 'A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.' " (*Johnson, supra*, 119 Cal.App.4th at p. 984.)

In each of the cases relied upon by Appellants, the examples of everyday decisions made by jurors were expressly and unambiguously used to expound upon the reasonable doubt standard. By contrast, the prosecutor in the instant matter did not reference any every day decision a juror would make. The comments appear to be directed not at the burden of proof, but strength of the evidence. In fact, it appears the prosecution was arguing that the evidence of guilt was so convincing that the jurors would remain convinced over time. This definition of an abiding conviction is consistent with how our high court defined that phrase. (See *People v. Brigham* (1979) 25 Cal.3d 283, 290 [noting abiding connotes "[t]he lasting, permanent nature of the conviction . . ."].) Put differently, there is nothing in the closing argument here that could lead the jury to believe the reasonable doubt standard is anything less burdensome than what is contained in CALCRIM No. 220, which was shown to the jury during the prosecution's closing argument. We determine the court did not err in finding no prosecutorial misconduct based on the closing argument.

III

*GANG EVIDENCE*

Appellants[3] claim the trial court erred in admitting "unlimited and largely unnecessary gang evidence." They assert the evidence was largely cumulative and deprived them of their rights to due process and a fair trial.

---

[3] Aguon joined all aspects of Meraz's appeal, including Meraz's objection to the gang evidence. However, in reviewing the gang evidence, it appears the lion's share of it was aimed only at Meraz. Meraz's arguments in his briefs focus primarily on the evidence as it relates to him. In the record, it does not appear Aguon's counsel was concerned with the gang evidence Meraz now challenges. Moreover, there is nothing in Aguon's or Meraz's

18

### A. The Gang Evidence

Meraz identifies three types of gang evidence that he claims was erroneously admitted at trial: (1) testimony from several percipient witnesses about Appellants' gang involvement; (2) telephone calls from jail made by Meraz; and (3) testimony from the prosecution's gang expert.

### B. Pre-trial Discussion of Gang Evidence

Prior to trial, the court discussed gang evidence at length with the parties. Meraz's counsel sought to limit the amount of gang evidence admitted at trial. The prosecution stated that witnesses would be called to avoid the use of testimonial hearsay by the gang expert as well as to prove the gang allegations against Meraz. Meraz's attorney argued that the prosecution's proposed use of multiple percipient witnesses to offer gang evidence would result in several "mini trials" involving a separate gang related incident involving Meraz. She asserted, "I mean the issue is not that [Meraz is] a gang member. It's proving the motivations and the intentions of going back there [the Balderas house] ten days later."

The trial court carefully considered the arguments and offered its perspective of recent gang related cases tried before it:

> "Well, you know, the last couple of gang trials I've done, your office has been doing this with more regularity. [¶] And I've been thinking about this. I didn't have any defense objection to it in these other cases. [¶] As we know, the U.S. Supreme Court does have a bee in its bonnet about confrontation and about hearsay evidence coming in and other people relying on that for purposes of lab reports, et cetera, and we all know that whole new line of case law. [¶] Whether you agree with it or not, confrontation is becoming a huge issue in the criminal defense

_____

briefs here that offers an argument why or how Aguon was prejudiced by the gang evidence. As such, we find no merit in any of Meraz's arguments as they apply to Aguon.

area.  [¶]  We have for decades, now, in the area of gang prosecution allowed a lot of hearsay in, and we tell the jury in the expert witness instruction that you don't have to accept the expert witness if you find that, you know, he didn't have sufficient evidence and all of this.  [¶]  I really do understand why the People are saying we are required to prove for purposes of gang allegation document motive, et cetera, and to just prove it up through hearsay—I read a report that he was there and had a gun and he was with this fellow gang member.  I do see that in terms of convincing a jury and having a jury rely on that information, that if the witnesses are available and if the District Attorney can leave it—.  [¶]  You know we're not going to call six witnesses, every single officer that might have been present, but if there are one or two witnesses that can briefly take the stand and say, 'I was there.  I saw this defendant in the presence of these fellow gang members and this is what they were doing,'  I do think he's allowed to do that.  [¶]  I would not allow it if it was going to require an undue consumption of time, but if one or two—these would be relatively quick witnesses.  I don't think there would be an extraordinary amount of cross-examination.  These are not issues strongly in dispute, I don't think.  [¶]  I'm inclined to allow it for the reasons stated."

Meraz's attorney responded:

"I think—isn't the issue, though, what the detective relies on?  [¶]  So whether or not these officers come in and say what happened, it still doesn't take away from the fact that the detective wasn't there.  He didn't see what happened.  He's already relied on these reports in making his opinion.  [¶]  So the fact that the jury hears as to what happened on such and such a date is irrelevant to the jury's determination.  It's only what the detective relies on in forming his opinion.  [¶]  I think it's a backdoor way of trying to get this kind of conduct in front of the jury to prejudice them against Mr. Meraz, saying: look, he's this gang member. He' s a bad guy. He hangs out with gang members all the time. He's got a gun—all the stuff that you're not allowed to do under—under our laws.  [¶]  So by bringing it in under the guise of it's something that the detective relies on in forming his opinion or showing that this is a gang crime is I think back dooring this evidence.  [¶]  Detective Sherman relies on the evidence whether he hears it live from the officer or whether he reads it in a report."

The trial court was not persuaded, emphasizing that the evidence was "more probative" through a "live witness" and the jury would be "more comfortable" "to rely on this information if they hear it firsthand." The court, however, offered to reconsider the issue if Meraz's counsel provided it with "some case law criticizing [its] position." Meraz does not cite to the record if or where his counsel provided any such authority.

## C. The Gang Evidence

### 1. *Percipient Witness Testimony*

Officer Michael Dewitt testified that while on patrol on August 1, 2005, he arrested Meraz for spraying graffiti, including the sign, "LV70," on a sidewalk in the Lomita Village neighborhood.

Detective Dave Collins, a gang suppression officer with a graffiti strike force, investigated Meraz's graffiti arrest. He also testified as an expert regarding the importance of "tagging" in the gang culture, and described how officers in his job rely on interviews that are conducted by other officers in the field.

Jose Torres, a current member of the WOP Town criminal street gang, testified that he knew Meraz as "Grims" and Aguon as "Villen." He said they "might" have been Lomita Village gang members.

Sergeant William Pettus testified that he interviewed Jose Torres while Torres was in juvenile hall in 2009, and bolstered Torres's reluctant testimony identifying both Meraz and Aguon as Lomita Village gang members.

21

District Attorney investigator Joseph Winney conducted an investigation in 2006 regarding a violent encounter involving Meraz and rival gang members. During the investigation, he interviewed Meraz and conducted a search of his home, where he collected gang related graffiti, and a notebook with a roster of gang members' monikers.

Retired officer Lawrence Eugene Wilson testified that he made contact with Meraz in January 2009 while Meraz was riding a bicycle around Lomita Park. Meraz admitted being in possession of a knife, and gave it to the officer. Wilson testified that the area was known as a gang hangout.

Officer Arthur Scott testified that in January 2007, he made contact with Meraz and two others, Enselmo Contreras and Daniel Ruiz, who were congregated in the street in Lomita Village. The boys wore baggy clothing and obstructed traffic in the street. Meraz was on a bicycle. Scott and his partner had the boys sit on a curb. Scott asked each boy to lift his shirt, and when Meraz complied, Scott saw a gun in Meraz's waistband. At that time, Ruiz ran away, and tossed a gun away as he ran. Scott caught him, and all three boys were taken into custody. Scott said the area was a known Lomita Village gang hangout.

Officer Luis Colon, Scott's partner, described the same incident, and confirmed that the gun possessed by Meraz was a loaded .38 caliber handgun.

Lori Black, a San Diego Police Department patrol officer, testified that in September 2005, she filled out a field interview form after making contact with Meraz and Jose Torres. Meraz told the officer he "kicked it" with "Lomita." In April 2006, Black stopped Aguon and a Jelani Bigby, who were in a vehicle speeding on a Skyline neighborhood street. Bigby, the driver, was known to associate with the Lomita Village gang.

22

Officer Mark Brenner made contact with Meraz in December 2008 and filled out a field interview form stating that Meraz claimed Lomita membership, and indicated his moniker was "Grims."

Officer Wade Irwin contacted Meraz in February 2011 in an area known as a hangout for Lomita Village gang members. Meraz said he was a Lomita Village gang member and went by "Grims." Meraz was wearing a black baseball hat with "TLS" on it, which Irwin knew to be a gang logo standing for Tiny Locos or Traviesos Locos. Irwin also contacted Aguon and Alberto Morin on April 18, 2010. Morin was known as a Lomita Village gang member.

Officer Kelvin Lujan conducted a field interview with Meraz and Alexander Rodriguez in May 2008. Meraz gave his moniker as "Grims." In July 2011, Lujan participated in a search of Aguon's home where several items of gang paraphernalia were recovered.

Officer Jack Pearson contacted Meraz in September 2005 and Meraz said he "kicked it" with the Lomita Village gang.

Officer Paul Choi contacted Aguon with Roberto Rodriguez and Anthony Echeves in January 2010 at Aguon's home. Choi said Rodriguez and Echeves were Lomita Village gang members and that Aguon went by "Villen."

Officer Lamar Rozas completed a field interview report on Aguon, Miguel Comenero, and Angel Nunez in October 2010. All three were Lomita Village gang members.

23

Officer Ramiro Rodriguez made a traffic stop in January 2008. Alexander Rodriguez was driving and Aguon was the passenger. Aguon was arrested for underage drinking.

Officer Kenneth Gray was working at a DUI checkpoint in December 2009. Aguon was stopped and detained because he did not have a license. He had a revolver in his waistband and knife in his pocket. Some hard-knuckled gloves were in his glove box.

Meraz's counsel made a standing objection under Evidence Code section 352 as to the testimony from these percipient witnesses.

### 2. *Telephone Calls*

Meraz also objected to the playing of Meraz's jail calls as hearsay and for relevance. As counsel argued, "If it's just being offered for the basis of Detective Sherman's opinion, what opinion is it that we're talking about? Is it the opinion that Rafael Meraz, aka Grims, is a member of Lomita Village Gang? I believe we have a lot of evidence of that." The prosecutor replied, "Your honor, it is highly probative. It does shore up the expert's opinion . . . ." The prosecutor argued that Meraz's reference to individuals by their gang monikers showed that he knew and associated with other gang members. The court asked if that was really in dispute, considering that Meraz's gang membership "has been proved 20 times yesterday." The prosecutor then argued, alternatively, that Meraz's statements on the phone were an admission to murder: "Every time when I'm going to fucking try to do good, bad shit happens. But when mother fucker out there doing his thing, ain't nothing happening. And I think that's referring to the fact that when he's out there committing crimes like the murder he committed on Halloween 2007, nothing happens." The court ultimately allowed the testimony under that theory, noting: "Okay. I see your theory there.

24

I have a different view of that.  [¶]  I think there's an argument that could somehow be tied to it.  I'm inclined to allow that and both sides can argue it, cause it's surely ambiguous as to what he really means."

### 3. *Expert Witness Testimony*

Gang expert Sherman explained the workings of Lomita Village, and how the evidence connected Meraz and Aguon to each other.  Sherman explained that there are about 30 documented Lomita Village gang members, but there were probably only about 22 in 2007.  He described tagging, or placement of graffiti, as being of extreme importance to a gang, tantamount to a business or political campaign advertising on billboards.  He explained what "putting in work" means to gangs; that gang members "earn stripes" by putting in work.  Sherman described the geographical area Lomita Village claims.   He explained that gang members usually go by monikers rather than their actual names, and that Meraz was "Grims" and Aguon was "Villen."

Sherman provided background information about the Lomita Village gang, showing the jury its two hand signs, and detailing its members primarily engage in murders, assaults with deadly weapons, vandalism, and methamphetamine trafficking.  He also explained the importance of "respect" in gang culture.  According to Sherman, respect is the "backbone" of gang life.  The respect, or lack of respect, does not necessarily need to be authentic, as long as it is perceived as respect or disrespect.  Fear is a close corollary to respect.  Disrespect to any member would warrant retaliation by the gang.

Sherman reviewed numerous photographs from field reports, along with photos, writings, and other items that had been found in the homes of the defendants and Meraz's jail cell. He described the significance of symbols, numbers, hats, hand signals, rosters, and tattoos. Meraz and Aguon appeared together in several of the photographs, along with many other Lomita Village gang members.

Referring to one officer's contact with Meraz and Daniel Ruiz, Sherman said Aguon was married to Ruiz's sister.

Sherman explained the significance of recorded jail calls Appellants had made. He deciphered what he described as the "code" used by gang members who know their calls are being recorded. He explained that he used the calls as part of the basis for his opinions about Appellants.

Sherman explained that guns are very important in gang life. They are a source of power. According to Sherman, there are serious consequences for a gang member who loses a gun belonging to the gang. In gang culture, it would be a very serious matter to be beaten up and have your gun taken, particularly if the people who took your gun then called the police. That gang member would feel further disrespected if those same people, didn't care about that gang member's neighborhood. Such a comment would be extreme disrespect to the gang member. Reprisal would be absolutely necessary. It would have to be definitive, and it would likely involve the assistance of the gun loser's closest friends. It would have to be of much greater force than the original disrespect.

26

Sherman explained that a shooting in retaliation for a gang member's having been beaten up and having his gun taken would benefit the gang member's gang. The beating and gun deprivation would constitute grave disrespect, and word of it would get out on the streets quickly. It would require quick and disproportionate retaliation to restore the reputations of both the gang member and the gang itself.

### D. *Legal Standard and the Law*

Evidence Code section 352 provides that a trial court may exclude evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Evidence of a person's gang affiliation is admissible if it is relevant to prove a disputed issue and its probative value is not outweighed by its prejudicial effect. (*People v. Champion* (1995) 9 Cal.4th 879, 922-923; *People v. Ruiz* (1998) 62 Cal.App.4th 234, 239-240; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369.) However, evidence of gang affiliation should be excluded if it is only relevant to prove a defendant's criminal disposition. (Evid. Code, § 1101, subd. (a); *Champion, supra*, at p. 913; *Ruiz, supra*, at p. 240.) Even if gang affiliation evidence is relevant, trial courts should closely scrutinize it because it "may have a highly inflammatory impact on the jury." (*People v. Williams* (1997) 16 Cal.4th 153, 193.) If evidence of gang affiliation is only tangentially relevant, it ordinarily should be excluded because of its highly inflammatory impact. (*People v. Cox* (1991) 53 Cal.3d 618, 660; *People v. Cardenas* (1982) 31 Cal.3d 897, 904-905 (*Cardenas*).)

27

On appeal, we apply the abuse of discretion standard in reviewing a trial court's decision to overrule an Evidence Code section 352 objection and admit evidence. "The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason." (*People v. Olguin, supra*, 31 Cal.App.4th at p. 1369.)

### E. *Analysis*

Meraz acknowledges that some gang evidence was admissible, but nonetheless argues that the "admission of extensive, cumulative, and prejudicial gang evidence was error and an abuse of discretion under state law[,] which violated [Meraz's] constitutional right to due process of law, requiring reversal." In this sense, Meraz appears to maintain that the prosecution should have only offered just enough but not too much gang evidence. He relies, among others, on *Cardenas, supra*, 31 Cal.3d 897, *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*), *People v. Avitia* (2005) 127 Cal.App.4th 185 (*Avitia*), and *People v. Bojorquez* (2002) 104 Cal.App.4th 335 (*Bojorquez*). All these cases are factually distinguishable.

In *Cardenas, supra*, 31 Cal.3d 897, the admission of gang evidence was offered to show that the defense witnesses were biased. But evidence had already been admitted that the defendant and the witnesses were neighborhood friends, and thus the fact that they were all members of the same gang was cumulative and more prejudicial than probative. (*Id.* at p. 904.) In *Avitia, supra*, 127 Cal.App.4th 185, the record showed "no evidence the charged crimes were related to any gang activity, the trial court admitted, over [the defendant's] objection, evidence that gang graffiti was found in [his] bedroom," and the

28

reviewing court "conclude[d] that admission of this evidence, which was unrelated to any issue at trial, require[d] reversal." (*Id*. at p. 187.) In *Bojorquez, supra*, 104 Cal.App.4th 335, the reviewing court likewise concluded that "the inquiry into gang matters should have ended with [the gang expert's] rebuttal of [the defendant's] and [a defense witness's] denials of gang membership contemporaneous with the offenses, as relevant to bias. Only in this connection was the subject of gangs implicated in this case." (*Bojorquez, supra*, at pp. 344-345.)

Here, in contrast to these three cases, the record broadly implicates the subject of gangs. Indeed, the crimes committed are nonsensical outside the gang context. The prosecution's theory at trial was that Meraz, a gang member of Lomita Village, was disrespected when he was beat up and disarmed in front of the Balderas house. Thus, it was important to Meraz and his gang, that Meraz retaliate. Meraz and two fellow gang members, one of which was Aguon, returned to the scene of Meraz's disrespect and shot Vidal, killing him. In no other context, but under the logic of a criminal street gang, are these actions explainable.

The evidence offered by the percipient witnesses established Meraz was a gang member and often associated with other gang members. The prejudice Evidence Code section 352 seeks to avoid is not the prejudice or damage to a defense that naturally flows from highly probative evidence. (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." (*People v. Farmer* (1989) 47 Cal.3d 888, 912.) Because the

29

probative testimony of the percipient witnesses did not prejudice Meraz in that sense, we reject Meraz's argument that the evidence was prejudicial under Evidence Code section 352.

Similarly, we do not find that the testimony of the percipient witnesses was so cumulative that the trial court should have excluded it under Evidence Code section 352. Meraz does not point to any stipulation in the record that he was a gang member. Further, the prosecution argued that it needed to provide live testimony of Meraz's gang involvement as opposed to hearsay testimony through an expert witness to avoid potential confrontation issues under the Sixth Amendment of the United States Constitution.[4] The trial court agreed, noting that the United States Supreme Court had a "bee in its bonnet" recently about confrontation issues and believed that the jury would benefit from hearing the live witnesses. The trial court further stated that it did not believe the admission of the evidence would involve mini-trials or consume too much trial time. In light of the trial court's stated reasons against the backdrop of our review of the record, we cannot say that the trial court's decision to allow the percipient witnesses to testify about Appellants' gang involvement exceeded "the bounds of reason." (See *People v. Olguin, supra*, 31 Cal.App.4th at p. 1369.)

---

[4]     The People point out that this issue is currently before the California Supreme Court, for reasons discussed in *People v. Hill* (2011) 191 Cal.App.4th 1104, 1127-1137. (*People v. Sanchez* (S216681) review granted May 14, 2014.) As explained in *People v. Hill*, though expert opinion basis evidence is theoretically not offered for its truth, and is therefore not hearsay, the argument can be made that if it is not offered for its truth, it really cannot be used to evaluate the expert's opinion, so it must actually be offered for its truth and thus be hearsay after all, possibly violating the Confrontation Clause. (*Hill*, *supra*, at pp. 1127-1137.)

30

We next address Meraz's challenge to the admission of Meraz's telephone calls from jail. At the outset, we note that Meraz refers to telephone calls, but only discusses a single telephone call. Moreover, as to this one call, the trial court did not admit the call as evidence of Meraz's involvement in the Lomita Village street gang, but instead, admitted it based on the prosecution's argument that the telephone call was an admission by Meraz that he committed murder. The trial court noted that the telephone call seemed ambiguous, but admitted it with the comment that the parties could argue about the call's meaning.

Here, Meraz does not offer any authority or argument explaining how the telephone call was prejudicial under Evidence Code section 352. Instead, he appears to argue the call was not relevant. " 'Only relevant evidence is admissible (Evid. Code, § 350; [citations] ), and, except as otherwise provided by statute, all relevant evidence is admissible[.] (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d).)' (*People v. Crittenden* [ (1994) ] 9 Cal.4th [83,] 132.) 'Relevant evidence is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.]" (*People v. Bivert* (2011) 52 Cal.4th 96, 116-117.) On this record, we cannot say the challenged telephone call was not relevant. We agree with the prosecution that it could be interpreted as an admission of guilt and the prosecution was free to argue as much during trial. Of course, Meraz had the opportunity to argue that the telephone call was not an admission, but mere gibberish. We see no error in the admission of this evidence.

31

Finally, we address Meraz's challenge to the prosecution's gang expert, Sherman. Initially, we observe courts "have long permitted a qualified expert to testify about criminal street gangs when the testimony is relevant to the case." (*People v. Gonzalez* (2006) 38 Cal.4th 932, 944.) Meraz does not argue that Sherman should have been excluded altogether. He nonetheless argues that most of Sherman's testimony should have been excluded because it "showed nothing but [Meraz's] propensity" for violence. We disagree.

Sherman was a key witness in Meraz's trial because his testimony explained the murder in the gang context. His testimony was necessary to describe how a gang's reputation would be enhanced by this violence and why a gang member would choose to retaliate with violence after Meraz altercation in front of the Balderas house. These are all matters " 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . .' " (Evid. Code, § 801, subd. (a); see also *People v. Ferraez* (2003) 112 Cal.App.4th 925, 930-931.)

Moreover, when provided a hypothetical that mirrored the evidence in this case, Sherman testified that a gang member, who had his gun taken and was beaten so badly he had to go to the hospital, and the gun was given to law enforcement, would have to respond with a retaliatory act using greater force and power to inflict a much greater injury. Sherman further opined the shooting, if committed by multiple Lomitas Village gang members, was committed in association with that gang and benefitted the gang. "It has also long been settled that . . . expert testimony regarding whether a crime is gang related specifically, may be given in response to hypothetical questions." (*People v. Vang* (2011) 52 Cal.4th 1038, 1049-1050, fn. 5].) Further, "[e]xpert opinion that particular criminal

32

conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit . . . a[] criminal street gang' within the meaning of section 186.22(b)(1)." (*People v. Albillar* (2010) 51 Cal.4th 47, 63.) This is precisely what Sherman's testimony established. Accordingly, this case shares none of the court's concerns in *Albarran, supra*, 149 Cal.App.4th 214, a case relied on by Meraz, where the gang expert conceded he did not know why the subject shooting occurred and could not connect it to a gang. (*Id*. at p. 227.)

In summary, we are satisfied the trial court did not abuse its discretion in admitting the challenged gang evidence. This was a gang case. Gang evidence, including expert witness testimony, was necessary. We find no error.

IV

*MERAZ'S SENTENCE*

Meraz was 15 years old when he committed the crime for which he was convicted. The United States Supreme Court and the California Supreme Court have provided clear rules for the sentencing of juveniles. A juvenile cannot be sentenced to capital punishment for any crime. (*Roper v. Simmons* (2005) 543 U.S. 551, 578-579.) A sentencing court may not sentence a juvenile to prison for life without the possibility of parole (LWOP) for nonhomicide offenses. (*Graham v. Florida* (2010) 560 U.S. 48, 75 (*Graham*).) A sentence for a juvenile who committed a nonhomicide offense that consists of a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy is prohibited. (*People v. Caballero* (2012) 55 Cal.4th 262, 268.) Mandatory life without parole sentences for juveniles, even those who commit homicide, are not permitted. (*Miller*

33

*v. Alabama* (2012) _____U.S. _____, 132 S. Ct. 2455, 2464.)  An LWOP sentence for juveniles who committed a homicide offense is allowable only if the court considers the " 'mitigating qualities of youth' " and limits "this harshest possible penalty" to those "rare juvenile offender[s] whose crime[s] reflect irreparable corruption."  (*Id*. at pp. 2467, 2469.)

Meraz contends his sentence violated the Eight Amendment and Fourteenth Amendments of the United States Constitution as well as Article I, section 17 of the California Constitution.  He thus argues that this case must be remanded so he can be resentenced.  The linchpin of Meraz's argument is that his sentence of 50 years to life is the equivalent to LWOP.  We disagree.

Meraz's sentence was statutorily authorized.  Section 190, subdivision (a) provides that the sentence for first degree murder "shall be . . . death, imprisonment in the state prison for life without the possibility of parole, or imprisonment in the state prison for a term of 25 years to life."  The Legislature has also fixed the punishment for a section 12022.53, subdivisions (d) and (e)(1) enhancement as 25 years to life.  Meraz was sentenced to 25 years to life for the murder and to a consecutive term of 25 years to life for a weapons allegation.  Both terms were authorized under the relevant statutes.  (§§ 190, subd. (a); 12022.53, subds. (d), (e)(1).)

Under California statutes, the sentences of death or LWOP apply to persons convicted of first degree murder with one or more special circumstances.  (§ 190.2)  In addition, section 190.5, subdivision (b) gives the court discretion to sentence a defendant who committed such a crime at age 16 or 17 to 25 years to life instead of LWOP.  Courts have held that a defendant who was 14 or 15 years old when he committed a murder may

34

not be sentenced to LWOP.  (*People v. Demirdjian* (2006) 144 Cal.App.4th 10, 17).  We therefore agree that Meraz could not have been sentenced to LWOP.  He was not.

However, Meraz argues that his sentence was the functional equivalent of LWOP.  In doing so, he relies primarily on *People v. Mendez* (2010) 188 Cal.App.4th 47.  In that case, the court reversed a sentence of 84 years to life for carjacking, assault with a firearm, and seven counts of robbery with gang and firearm enhancements for a defendant who was 16 when he committed the crimes.  (*Id.* at pp. 62-68.)  The court noted that because the defendant would not be eligible for parole until he was well past his life expectancy, his sentence was " 'materially indistinguishable' " from LWOP.  (*Id.* at p. 63.)

The instant matter is distinguishable from *People v. Mendez, supra*, 188 Cal.App.4th 47.  In that case, the defendant committed a nonhomicide crime.  In contrast, Meraz was convicted of murder.  In addition, the sentence in *People v. Mendez* clearly did not offer the defendant a meaningful opportunity for parole during his lifetime.  We do not have the same concerns here.

Nevertheless, Meraz still claims his 50 years to life sentences constitutes LWOP.  He asserts that the current life expectancy for a Hispanic male in the United States is 78-79 years, as determined by the Centers for Disease Control and Prevention.  (United States Life Tables, 2009 (1/ 6/ 2014) National Vital Statistics Reports, Vol. 62, No. 7.)  Although he claims that he would be eligible for parole when he is about 70 years old (within his life expectancy), Meraz cites the following:

> "The combination of physical and mental declines makes aging
> inmates, on the average, 10 to 11.5 years older physiologically than
> their nonincarcerated age peers (Doughty, 1999; Southern Legislative

Conference, 1998). This is why most recent studies consider either age 50 or 55 as the onset of old age for inmates [] For our purposes, then, an elderly male inmate is defined as age 50+. (Rikard, R. V., & Rosenberg, E. (2007). Aging Inmates: A Convergence of Trends in the American Criminal Justice System. Journal of Correctional Health Care 13(3):150-162. (July 2007) online version available as of 11/10/13 found at: http://jcx.sagepub.com/content/ 13/3/150.)"

Based on this journal article, Meraz argues that "[i]t is reasonable . . . to assume [his] physical age will be closer to 80 to 85 years old at the time he first becomes eligible for parole." As such, Meraz insists he will effectively be beyond his current life expectancy of 78-79; therefore, making his current sentence an unconstitutional LWOP.

We note that Meraz's argument that his sentence is a de facto LWOP is contingent on the assumption that his "physical age" will be 80-85 years, which is based on the Rikard and Rosenberg article. We decline to accept an assumption based on an article that Meraz does not assert was presented to the sentencing court to argue that the proposed 50 years to life sentence was unconstitutional. As Meraz admits, his life expectancy is 78-79 years. He committed his crime at age 15. He was not tried or sentenced until he was 20. He received credit for 842 days of time served at the time of trial. Thus, Meraz, at the time of sentencing, had already served over two years of his sentence. As such, even if we assume the earliest he would serve a minimum of 50 years before he was eligible for parole, he would be 68 years old. We therefore cannot necessarily conclude that a sentence of 50 years to life imposed on a juvenile offender who was 15 when he committed homicide constitutes a de factor LWOP. It is entirely possible that Meraz will become eligible for parole or release during his lifetime.

36

Having determined that Meraz's sentence is not an LWOP, we do not address the impact of Senate Bill No. 260 on Meraz's sentence.

## V

### *ABSTRACTS OF JUDGMENT*

Appellants maintain, and the People concede, minor errors plague their respective abstract of judgments. For example, Aguon argues that his abstract of judgment's reference to a stayed "PC 120222.53(D)&(3)(1)" enhancement should actually read "12022.53(D)&(E)(1)," with the "(E)(1)" replacing the "(3)(1)." Also, the abstract inserts an extra "2" in the listed code section: "120222.53" should be "12022.53."

Aguon also points out a problem with item 6 in the abstract of judgment. Item 6 is one of three places (along with 4 and 5) to list indeterminate terms, and has four check-boxed subparts, labeled "a," "b," "c," and "d." Each subpart has either one or two blanks. Directly beneath item 6 is the legend, "PLUS enhancement time shown above," an apparent reference to tables 2 and 3, which are for enhancements. In Aguon's abstract, 6(b) is checked, and reads, "25 years to Life on counts 1." Subpart "d" is checked and reads "25LIFE years to Life on counts 1 ALE." However, subpart "d" is not correct. It appears that the clerk used "d" to record Aguon's 25-year-to-life gun use enhancement, with "ALE" denoting "allegation." But that was unnecessary. Item 6 is only for listing time on substantive offenses, not enhancements; hence its notation, "PLUS enhancement time shown above." The clerk had in fact already listed the 25-year-to-life enhancement in table 2 on the form. There was thus no need to repeat the information in item 6.

37

There also exists a similar problem in Meraz's abstract of judgment. There, item 6, subpart "d" is checked, and reads, "25 years to Life on counts 1 ALL," again apparently referring to the gun use enhancement, with "ALL" being an abbreviation for "allegation."

The trial court should correct these minor problems with the abstract of judgment so they correctly reflect the subject convictions and sentences.

DISPOSITION

The judgment is affirmed. The matter is remanded to the superior court with directions to correct the clerical errors in the subject abstract of judgments.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.

38