[No. B153046. Second Dist., Div. Eight. Nov. 13, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
ISMAEL BOJORQUEZ, Defendant and Appellant.

## COUNSEL

Kyle Marie Wesendorf, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Ana R. Durate and Betty B. Chim, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**COOPER, P. J.**—Ismael Bojorquez appeals from the judgment rendered after a jury convicted him of robbery (Pen. Code, § 211; undesignated section references are to that code) and false imprisonment by violence (§ 236), and found that he personally used a firearm in committing both offenses (§§ 12022.5, subd. (a)(1), 12022.53, subd. (b)), and was armed when he committed the false imprisonment (§ 12022, subd. (a)(1)). Sentenced to a term of 16 years, he contends that the admission of testimony as to his and a defense witness's gang affiliation, and about certain criminal characteristics of gangs, constituted reversible error. We conclude that although the evidence regarding common gang membership was admissible for impeachment, the court abused its discretion in further admitting wide-ranging testimony about gangs' criminal tendencies. Because the error was prejudicial, we must reverse the judgment.

### FACTS

Appellant was charged together with Emiliano Gutierrez, who pled no contest to the robbery count at the commencement of trial and is not a party to this appeal. Viewed in accordance with the governing rules of appellate

review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence showed that in the spring of 2000, Gutierrez had lived at the Long Beach apartment of Raymond Chavarria. At the end of May, however, Gutierrez had a physical fight with Chavarria, who had him arrested. Some of Gutierrez's belongings remained in the apartment.

Chavarria testified that shortly before 1:30 a.m. on the morning of July 31, 2000, his doorbell rang. Opening the door, he saw Gutierrez, who asked to see Chavarria's current roommate, Martin Sanchez. When Chavarria turned to call to Sanchez, appellant, then age 16, entered the apartment and put a handgun to Chavarria's head. Appellant told Chavarria to get on his knees and put his hands behind his head. Meanwhile, Gutierrez, carrying a pipe, proceeded to the dining room, where Sanchez was talking on the telephone.

Appellant asked Chavarria where his money was. Chavarria replied that he had none. When appellant persisted, Chavarria told him he did have some jewelry in his bedroom. The two proceeded there. Pointing the gun at Chavarria, appellant removed jewelry from the dresser, including a watch, bracelets, and a gold ring with a black center. Gutierrez then entered the bedroom, and took $30 from a nightstand. He asked Chavarria if he had money in the bank, and when Chavarria replied that he did, Gutierrez said they should go there. Appellant stated, "Let's go."

Appellant led Chavarria at gunpoint downstairs toward his car, with Gutierrez and Sanchez accompanying them. Chavarria then realized he had forgotten his car keys, and he, Gutierrez, and appellant returned to the apartment. Sanchez remained behind.

Called by both the prosecution and the defense, Sanchez testified that when he came downstairs with the others he saw police officers, whom he told to go upstairs. He was handcuffed and placed in a police car. Sanchez testified he had previously been ordered into the bathroom, but could not specify by whom. In his testimony, Sanchez for the most part could not recall the details of the events. He stated he didn't want to be in court, but denied being fearful of appellant, or Gutierrez.

Long Beach Police Officer George Sargent responded to the location with other officers, and Sanchez opened the security gate to admit them. Officer Sargent testified that Sanchez told him he had called 911 after seeing two men enter the apartment with a gun. Sanchez also informed the officer he

had recognized the men as members of a tagging crew, with whom he used to tag, or paint monikers.[1]

Officer Eduardo Reyes and a sergeant went up to the apartment. Chavarria answered the door, with Gutierrez behind him. Officer Reyes saw appellant walk rapidly from a hallway near the bathroom. The officer ordered everyone outside. Searching the apartment, he found a .380 handgun under the bathroom sink, loaded and with a round in the chamber. The bathroom window screen had been bent in, as if someone had tried to escape or place something outside. Officer Reyes also recovered some jewelry, at the foot of the bed in the bedroom, which he gave to Chavarria.

Officer David Ebell searched appellant and found in his pocket a gold ring with a black center. The officer showed the ring to Chavarria, who stated it was his. Officer Craig Rose searched Gutierrez, and recovered a gold ring and necklace that he was wearing, as well as $53 in currency.

Appellant testified in his defense.[2] He stated that Gutierrez was a friend, and they had gone to Chavarria's to retrieve clothing and money Gutierrez had left there. Together with Christian Jiminez and another friend named Hector, the two first went to the home of Gutierrez's girlfriend, from whom Gutierrez was to obtain a gold ring with a black stone, which he had taken from Chavarria and intended to return. Arriving at Chavarria's, Gutierrez asked appellant to make the exchange, because Gutierrez was under a restraining order against visiting Chavarria. Appellant was not carrying a gun. When no one answered the door, he returned to Gutierrez. The two of them proceeded upstairs; Gutierrez knocked; and they were admitted.

According to appellant, Gutierrez and Chavarria then engaged in a "dispute" about what Gutierrez was owed.[3] Chavarria said he would let Gutierrez have some jewelry until he had the money to repay him. Chavarria led Gutierrez and appellant into the bedroom, where Chavarria extracted jewelry from the dresser and gave a necklace to Gutierrez, who put it on, along with a ring. Appellant did not take any jewelry, although he still had the ring Gutierrez had given him. Gutierrez then asked whether Chavarria had any money in the bank, and Chavarria volunteered that he could take Gutierrez to the automated teller machine and exchange money for the jewelry.

Chavarria called to Sanchez, who emerged from the bathroom and joined the others in going downstairs. Near the bottom, Chavarria said he'd forgotten his garage door opener. Sanchez waited downstairs while the others

---

[1]At trial, Sanchez denied these statements.

[2]The trial court granted appellant's motion under section 1118.1 with respect to allegations that appellant had committed the offenses against Sanchez as well as Chavarria.

[3]Appellant stated that Gutierrez also spoke to Sanchez, who went back to the bathroom and remained there for quite a while.

returned to the apartment to look for it. They were doing so when the police arrived.

In his defense, appellant testified on direct examination that he had been a gang member from 1996 until April 2000, when he was seriously stabbed. The birth of his child in June 2000 also had solidified his desire no longer to engage in gang activities. Appellant denied ever being stopped together with Gutierrez by Long Beach Police Detective Onorio Galvan. On cross-examination, appellant further denied admitting to Detective Galvan, on four occasions in June and July of 2000, that he was then a member in the Barrio Small Town gang (BST). Appellant admitted speaking to Detective Galvan, who was aware of appellant's former membership. Appellant knew that Christian Jiminez was a member of that gang. Appellant acknowledged having two BST tattoos, one of which he exhibited to the jury. In addition, Sanchez and Gutierrez had been part of a tagging group, but appellant had not. Appellant denied being seen in the bathroom where the gun was found, or prying off the screen. He admitted having suffered convictions for assault with a knife and selling cocaine, at ages 12 and 15. In the latter case, he had given the authorities a false name.

Two further defense witnesses testified about events immediately preceding the offenses. Jeannette Rodriguez, Gutierrez's girlfriend, testified that late that night Gutierrez had arrived at her home and had asked to use the phone, because he wanted to go pick up some things. During the phone call, Gutierrez said he would be doing that. He retrieved from Rodriguez a gold ring with black stone, which he had previously asked her to hold for him. On cross-examination, Rodriguez testified she was "here to help" appellant, because he had a child.

Christian Jiminez testified he had been with appellant, Gutierrez, and Hector, and that they had gone for a few minutes to a location at which Gutierrez got out of the car and then returned. The four then drove to Chavarria's address, where Gutierrez said he was going to pick up some things. Appellant, who did not have a gun, got out of the car but then returned, saying there had been no answer. Gutierrez accompanied him back up. Jiminez and Hector waited about 10 minutes and then departed. On cross-examination, Jiminez admitted having been a BST member until November 1999, when his child was born, but denied being active in the gang in June or July 2000. Asked whether BST's tenets included testifying to help fellow members, he stated he knew of no instances of that.[4]

The prosecution called Detective Galvan as a rebuttal witness. At a bench conference requested by defense counsel, the court asked the prosecutor

---

[4]The court overruled appellant's objection to questions whether a member who "snitched" on another would likely be killed. The witness replied that he did not know.

what Galvan would testify to, besides appellant's having admitted to gang membership. The prosecutor replied, "In addition to that, he's expert in the field of gangs and in his experience bad things happen to people who snitch on the gang, and also . . . it's a common understanding that gang members will testify for fellow gang members." Appellant's counsel objected that there had been no advance notice of such testimony, permitting the defense to evaluate the officer's expertise or obtain its own expert, and also that "the prejudice would outweigh the probative value . . . ." The court overruled the objections, stating that notice was not required for rebuttal testimony, and that "we could almost say it's common knowledge that if indeed there is a violent street gang, people that inform on [it] might suffer some consequences."

Detective Galvan proceeded to testify as follows. He was assigned to the gang enforcement unit. During his initial academy training, about eight years before, he had taken a course on gangs, particularly those in Long Beach, in which he had learned that the largest gang population in the city was Hispanic, "that gangs like to mark their territory by tagging," and that each had a known neighborhood. He added, "I also learned that these gangs are involved in a lot of criminal activity. Usually what they do is for the cause of the gang as far as, like, respect or making money. It could be for selling narcotics, robberies, auto thefts for vehicles."

In subsequent training, the detective "learned everything from . . . Asian Gangs to Motorcycle Gangs, Aryan Brotherhood Gangs, mostly how their main motivation is for profit, profit through drugs, like I said, robberies. [¶] Any[]way they can get their money through intimidation of people and how they also protect each other." This included putting a "hit" on a victim or witness when a member faced trial. Moreover, "There is a code within the gangs how you never testify against each other and, if you do, you get killed or you get beat up." As an example, Detective Galvan described an investigation involving rival Asian gangs, in which the victims failed to identify a suspect at a lineup, but then immediately admitted that the perpetrator had been there. Asked why they hadn't identified him, "They said, on the streets, we don't testify against each other. We take care of it internally . . . ."

Detective Galvan identified BST as a Hispanic gang with upwards of 150 members. He classified it as a gang "Because of the criminal activity they've been in." On June 4, and again on June 27, 2000, the detective had encountered appellant and Jiminez together, and both had stated that they were BST members. Appellant had done so again on July 17 and 24, 2000.

The trial court instructed the jury with a modified version of CALJIC No. 2.50, to the effect that, if believed, the evidence introduced to show that

appellant and others were members of a gang could be considered "only for the limited purpose of determining if it tends to show bias," and not "to prove that defendant is a person of bad character or that he has a disposition to commit crimes," or for any other purpose.

The prosecutor began his summation by recalling Sanchez's failure of recollection, and argued that "Sanchez knew how dangerous that person is," and "You don't go in there and testify as a snitch against Barrio Small Town. You're going to pay if you do." The prosecutor concluded his closing argument with a similar comment.

## DISCUSSION

Appellant contends it was reversible error to admit Detective Galvan's testimony concerning gangs. Appellant argues that none of the testimony was relevant to the issues in the case, and hence admissible (Evid. Code, § 350), except for the identification of appellant and the witness Jiminez as members of the BST gang, a relationship that could be said to show bias on Jiminez's part (Evid. Code, § 780, subd. (f)). Appellant further contends, however, that even that evidence should have been excluded, under Evidence Code section 352, because its prejudicial effect outweighed its probative value, given that evidence of appellant and Jiminez's friendship and relationship had already been admitted.

We consider first the evidence of the joint gang membership of appellant and Jiminez, in particular Detective Galvan's testimony that on several occasions in June and July 2000 they told the detective they were BST members. Appellant acknowledges that a witness's common gang membership with a defendant on whose behalf he testifies is relevant to establish the witness's bias. (*In re Wing Y.* (1977) 67 Cal.App.3d 69, 76-77 [136 Cal.Rptr. 390]; see *United States v. Abel* (1984) 469 U.S. 45, 49, 52 [105 S.Ct. 465, 467-468, 469, 83 L.Ed.2d 450].) On the other hand, it has consistently been held that where other evidence shows the witness's association with the defendant, evidence of their gang membership should be excluded under Evidence Code section 352, in view of its inflammatory and prejudicial nature. (*People v. Cardenas* (1982) 31 Cal.3d 897, 903-905 [184 Cal.Rptr. 165, 647 P.2d 569] [probative value "minimal at best" in light of evidence of friendships, and substantial danger of prejudice in that jury could infer defendant had a criminal disposition because gangs commit crimes]; *People v. Davis* (1996) 42 Cal.App.4th 806, 813 [49 Cal.Rptr.2d 890] ["This case presents no exception to the well-settled rule that the use at trial of cumulative evidence of bias in the form of gang-affiliation evidence constitutes an abuse of discretion"]; *People v. Maestas* (1993) 20 Cal.App.4th 1482, 1495 [25 Cal.Rptr.2d 644].)

In the present case, there was independent evidence of a relationship between Jiminez and appellant. In addition to their presence together on the night of the offenses, Jiminez testified that appellant was his friend, whom he had known for two or three years. Although this evidence weighed against admitting gang membership to show bias, appellant himself had recounted, in his direct testimony, that he had been a gang member from 1996 until April 2000, shortly before the offenses. And on cross-examination he had denied admitting to Galvan in June and July 2000 that he was a member of BST. Appellant further admitted knowing Jiminez was a member of BST, but denied being an active BST member when in Jiminez's company on the night of the offenses.

In light of this record, we cannot say it was an abuse of discretion to permit Galvan to testify that appellant—in two instances along with Jiminez—had admitted membership in BST on the occasions in June and July 2000 which appellant had denied. In addition to reflecting an ongoing relationship that would further impeach Jiminez, this testimony impeached appellant's denial of his admissions, and also his claim that his gang membership had ended earlier. Given these several probative features, as well as the already existing references in the evidence to appellant's and Jiminez's gang membership, the balance between probative value and prejudicial effect did not clearly weigh against this portion of Galvan's testimony.

The same cannot be said, however, regarding other elements of Detective Galvan's testimony.[5] Galvan testified that (1) gangs in Long Beach were predominantly Hispanic; (2) gangs engaged in tagging; (2) they were involved in and motivated by profitable criminal activity, including robbery; (3) gang members protected each other by killing witnesses against them; (4) gang members did not testify against one another (as illustrated by an example involving an Asian gang), or faced being killed or beaten up; (5) BST, appellant's gang, was a Hispanic gang, involved in criminal activity. The probative value of this evidence with respect to disputed issues or facts in the case (see Evid. Code, § 210) was minimal, if not nonexistent.

---

[5]Appellant did not waive his right to assert error in the admission of this testimony. Appellant's objection to the prosecutor's offer of proof before Detective Galvan testified, to the effect that "the prejudice would outweigh the probative value," properly invoked Evidence Code section 352. (*People v. Green* (1980) 27 Cal.3d 1, 24 [164 Cal.Rptr. 1, 609 P.2d 468].) Although appellant's failure to object on the distinct ground of irrelevancy precludes review on that basis alone, the section 352 objection necessarily implicated the relative probative value of the evidence, and thus its degree of relevance, if any. With regard to Galvan's testimony about the nature and behavior of gangs, appellant did not need to reassert his section 352 objection after it had been overruled. (See *People v. Morris* (1991) 53 Cal.3d 152, 188-189 [279 Cal.Rptr. 720, 807 P.2d 949]; *City of Long Beach v. Farmers & Merchants Bank* (2000) 81 Cal.App.4th 780, 784-785 [97 Cal.Rptr.2d 140].) Moreover, respondent itself has observed that the trial court weighed the admissibility of this evidence under section 352.

Respondent asserts that the evidence either was "foundational," or was relevant to show bias, on the part not only of Jiminez but also of witnesses Jeannette Rodriguez and Sanchez, as well as to impeach their character for honesty and veracity (Evid. Code, § 780, subd. (e)). But elaborations about the ethnic composition and criminal habits of gangs were neither a necessary nor a proper foundation for Galvan's capacity to testify about them. With respect to the alleged relevance for impeachment, there was no such relevance with respect to Rodriguez.[6] As for Sanchez, the prosecutor apparently desired to show that his forgetful accounts of the events, at the crime scene and later in court, had been influenced by either by gang practice or apprehension of gang retaliation. But there was no evidentiary link between this notion and Sanchez's situation, other than his out-of-court reference to having recognized appellant from a "tagging crew." (Cf. *People v. Harris* (1985) 175 Cal.App.3d 944, 950, 957 [221 Cal.Rptr. 321] [demurring witness's pretrial statement that he was afraid to testify because defendant gang members would retaliate admissible for impeachment].) Moreover, the inference, later pursued in argument, that Sanchez was in fear of appellant or his gang was remote. And Evidence Code section 780 did not authorize "impeaching" Sanchez (or Jiminez) for untruthfulness with generalizations that gangs, and BST in particular, were involved in robbery and other crimes.

In *In re Wing Y., supra,* 67 Cal.App.3d at page 79, the court observed that testimony about the criminal activities of the appellant's gang, offered in connection with membership evidence to show bias, did not reasonably tend to prove the conduct of an individual member on a given occasion. Similarly, the testimony here about the criminal tendencies of gangs—appellant's in particular—and about their members' unwillingness to testify against each other and inclination to eliminate adverse witnesses lacked substantial probative value.

The prejudicial tendency of the evidence is plain, and significant. Detective Galvan's repeated references to gangs' pursuing robberies, followed by his declaration that BST was involved in criminal activity, tended to ascribe guilt of that conduct to appellant. "These [answers] made it a near certainty that the jury viewed appellant as more likely to have committed the violent offenses charged against him because of his membership in the [BST] gang." (*People v. Cardenas, supra,* 31 Cal.3d at p. 906.) And the same is true of Galvan's accounts of how gang members evade testimony, including through physical retribution. (Cf. *People v. Maestas, supra,* 20 Cal.App.4th 1482, 1499-1501.)

In sum, this a case in which, as in *In re Wing Y., supra,* 67 Cal.App.3d at page 77, the inquiry into gang matters should have ended with Detective

---

[6]Moreover, her bias, as Gutierrez's girlfriend and a supporter of appellant, was already of record.

Galvan's rebuttal of appellant's and Jiminez's denials of gang membership contemporaneous with the offenses, as relevant to bias. Only in this connection was the subject of gangs implicated in this case. The remainder of Galvan's testimony should have been excluded under Evidence Code section 352. (*People v. Cardenas, supra,* 31 Cal.3d at pp. 904-905; *People v. Maestas, supra,* 20 Cal.App.4th at p. 1494; *People v. Perez* (1981) 114 Cal.App.3d 470, 477-479 [170 Cal.Rptr. 619].)

The remaining question is whether the error was prejudicial, that is, whether it is reasonably probable that a result more favorable to appellant would have occurred had the objectionable gang testimony not been admitted. (*People v. Maestas, supra,* 20 Cal.App.4th at p. 1498.) We conclude that the error was thus prejudicial.

Erroneous admission of gang-related evidence, particularly regarding criminal activities, has frequently been found to be reversible error, because of its inflammatory nature and tendency to imply criminal disposition, or actual culpability. (E.g., *People v. Maestas, supra,* 20 Cal.App.4th at pp. 1498-1501; *People v. Perez, supra,* 114 Cal.App.3d at p. 479; *In re Wing Y., supra,* 67 Cal.App.3d at p. 79.) The evidence here particularly carried that prospect. Detective Galvan depicted gangs not simply as prone to criminality, but as thriving on robberies, and he specifically ascribed criminal behavior to BST. His reference to the abundance of Hispanic gangs in Long Beach was directly prejudicial to appellant. (Cf. *People v. Casteneda* (1997) 55 Cal.App.4th 1067, 1072 [64 Cal.Rptr.2d 395] [testimony that typical heroin dealer is usually a Hispanic male adult held error, contributing to reversal].) As stated in *Castenada,* "every defendant has the right to be tried based on evidence tying him to the specific crime charged, and not on general facts accumulated by law enforcement . . . ." (*Ibid.*) Moreover, the testimony about gang retaliation against witnesses, although unconnected to appellant, also was inflammatory, and engendered the prosecutor's assertive comments in final arguments.

In contrast with this heavy prejudicial tendency, the relevant evidence of guilt was not overwhelming. Chavarria alone recounted the offenses, while appellant, supported by his witnesses, testified to a coherent, innocent explanation of the night's events.

■ Finally the limiting instruction regarding gang evidence did not assure that its prejudice would be defused or deflected. The instruction was directed only to evidence that appellant and others were members of a gang. It did not address the profuse additional testimony about gangs. ■ We conclude that there is a reasonable probability that appellant would have obtained a more favorable result absent that testimony.

## DISPOSITION

The judgment is reversed.

Rubin, J., and Boland, J., concurred.