Filed 6/2/15  P. v. Mixon CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B256389 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. TA129185) |
| DESMEN DEMAY MIXON et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Shultz, Judge.  Affirmed as to Mixon; affirmed as modified as to Harris.

Patrick Morgan Ford, under appointment by the Court of Appeal, for Defendant and Appellant Desmen Demay Mixon.

Michele A. Douglass, under appointment by the Court of Appeal, for Defendant and Appellant Derrick Kehohnna Harris.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael C. Keller and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Defendants Desmen Demay Mixon and Derrick Kehohnna Harris separately appeal their convictions for robbery and related counts. We reject their argument that the trial court abused its discretion in refusing to bifurcate gang evidence from the trial on the charged robbery. We also reject Mixon's separate argument that the trial court erred in denying a motion for a mistrial after a prosecution witness briefly alluded to Mixon's prior incarceration in violation of a court order excluding that evidence. Because Mixon does not raise any additional contentions, we affirm the judgment as to him. For the judgment as to Harris, we strike the gang enhancement connected to his conviction for violating a gang injunction and correct an error in the criminal conviction fee assessed. So modified, we affirm the judgment as to Harris.

## PROCEDURAL HISTORY

Defendants were jointly charged with one count of second degree robbery of Curtis Blackwell (Pen. Code, § 211; count 1),[1] with enhancements that it was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)), that a principal used a firearm (§ 12022.53, subds. (b) & (e)(1)), and that Harris personally used a firearm (§ 12022.53, subd. (b)). Harris was additionally charged with one count of possession of a firearm by a felon with a prior (§ 29800, subd. (a)(1); count 2) with a street gang enhancement (§ 186.22, subd. (b)(1)(A)), and one count of misdemeanor disobeying a court order (§ 166, subd. (a)(4); count 3) charged as a felony because it was committed for the benefit of a street gang (§ 186.22, subd. (d)). It was further alleged Mixon had a prior conviction for burglary that constituted a strike, a serious felony, and a prior prison term. (§§ 667, subds. (a)(1) & (b)-(i), 667.5, subd. (b), 1170.12.)

Following trial, a jury found defendants guilty on all counts and found all enhancements true. The court later found the prior conviction allegation as to Mixon true. The court sentenced Mixon to 21 years in prison, consisting of a three-year midterm for the robbery, doubled under the three strikes law, plus 10 years for the gang enhancement, plus five years for the section 667, subdivision (a) enhancement. The court

---

[1] Undesignated statutory citations are to the Penal Code unless otherwise noted.

stayed the firearm enhancement and struck the prior prison term enhancement. The court sentenced Harris to 15 years in prison, consisting of a five-year upper term for the robbery, plus 10 years for the firearm use enhancement. The court granted Harris's motion to strike the gang enhancement for the robbery count and stayed the three-year high term for the felon in possession count, along with the four-year high term for the gang enhancement on that count. The court also imposed a concurrent six-month term on the count of disobeying a court order and a concurrent two-year term for the gang enhancement on that count. Defendants timely appealed.

## STATEMENT OF FACTS

In the late afternoon of July 1, 2013, victim 68-year-old Curtis Blackwell rode his "trike" motorcycle to Hawkins House of Burgers (Hawkins), a "walk-in" burger restaurant on the corner of Imperial Highway and Slater Street in Los Angeles. Around 15 people were there when he arrived. He ordered his food and went outside to sit on his motorcycle to wait. He saw defendants about nine feet away. Mixon was not wearing a shirt and Harris was wearing a pullover-type shirt. Blackwell saw Mixon had the letters "B" and "H" tattooed on his chest and asked him about them. Mixon responded they were his girlfriend's initials. Blackwell asked Harris if he knew him and asked his age. Harris responded he was 33,[2] and Blackwell said he could not have known him because he was too young. The conversation was casual and Blackwell saw both defendants clearly.

As Blackwell waited for his order, defendants suddenly "flanked" him. Harris put a silver handgun to Blackwell's neck area and said, "Give me your chain," referring to the chain around his neck. Mixon grabbed the chain, breaking it. Defendants fled across Imperial Highway toward the Nickerson Gardens apartments. Blackwell pursued them on foot, but Harris stopped and pointed the gun at him. Blackwell heard someone say, "He's got a gun," so he stopped and returned to Hawkins. He jumped on his motorcycle

---

[2]    Harris's date of birth was September 9, 1991, making him 21 at the time of the conversation with Blackwell.

and searched for defendants, but when he was unable to find them, he returned to Hawkins and had someone call the police. Two deputy sheriffs arrived, and he told them what happened. The next day, Blackwell went to the Century Sheriff's station and gave a physical description of the suspects, including describing Harris as having a shaded beard and a receding hairline and Mixon as having the letters "B" and "H" tattooed on his chest.

Detective Dennis Parker went to Hawkins but did not obtain any additional information about the robbery. He used computer databases to search for a Black male with "B" and "H" tattoos and a similar height and weight as described by Blackwell. He came up with a possible suspect, but when he showed Blackwell a six-pack photographic lineup containing the suspect's photograph, Blackwell did not identify anyone. Sometime later, Los Angeles Police Officer Sharon Kim reviewed the report of the crime. She was assigned to the Nickerson Gardens housing project and had become familiar with residents of Nickerson Gardens, as well as members of the Bounty Hunters gang in the area. She told Detective Parker she may know the suspects. Detective Parker placed photographs of the suspects suggested by Officer Kim into two separate six-pack photographic lineups and showed them to Blackwell. Without hesitation, Blackwell identified both defendants. Detective Parker then showed him a photograph of Mixon's chest tattoos, which he also identified. Blackwell again identified defendants at trial without any doubt.

Harris was arrested on July 18, 2013, and Mixon was arrested two weeks later. When Harris was taken into custody, he asked, "Is this about a robbery?" Cell phones were taken from both defendants. No information was recovered from Harris's phone except the phone number, but three text messages were retrieved from Mixon's phone that were sent from his phone on the day of the robbery. The first was sent at 7:22:04 p.m., stating, "I just chase a Nigga worn [*sic*] a gun." The second was sent at 8:00:47 p.m., stating, "I just hit a lick. Yeah. Yeah, babe." "Hitting a lick" was slang for committing a crime, typically a robbery or burglary. The third message was sent at

4

8:00:59 p.m., stating, "I need you ASAP." Based on Mixon's phone and Harris's phone records, there was no indication of any contact between Mixon's and Harris's phones.

During an interview with Detective Parker, Harris admitted he was a Bounty Hunter gang member. He stated he frequently went to Hawkins to eat, and he may have been there at the time of the robbery but could not remember. He denied knowing anything about the robbery. During Mixon's interview, he showed Detective Parker his "B" and "H" tattoos, which were consistent with Blackwell's description of them. Mixon said the letters stood for Bounty Hunters. With regard to the robbery, he stated he phoned in an order to Hawkins that day and walked there from Nickerson Gardens with a friend named Rondo to pick it up. His order was not ready, so he stood near the front entrance to wait. He was shirtless at the time. When his order came up, he grabbed his food and he and Rondo began walking across Imperial Highway toward Nickerson Gardens when two Black males sprinted past them into Nickerson Gardens with Blackwell chasing them. He did not recall having a conversation with Blackwell about his tattoos prior to the robbery. He initially denied knowing Harris, but then said he had known him for two to three years from around Nickerson Gardens and at parties. Mixon had additional tattoos on his forearms of "115th Street" and "Savage."

Detectives searched an apartment at Nickerson Gardens where Harris might have been living, but did not recover anything. They made contact with Harris's girlfriend Keshia Brown, who lived there, and learned Harris lived in Lancaster with his grandmother.

At trial, Officer Kim testified as a gang expert for the prosecution. She was part of a Community Safety Partnership (CSP) unit assigned to Nickerson Gardens and had testified as an expert on the Bounty Hunters gang approximately 10 times. The Bounty Hunters gang had 800 members in Nickerson Gardens and elsewhere, although Nickerson Gardens was its place of origin and its stronghold. The members used hand signals, gang graffiti, and tattoos often using the letters "B" and "H." They committed robberies, grand theft auto, burglaries, narcotics sales, weapons possession, kidnapping, murder, shootings, assaults with deadly weapons, and extortion, among other activities. They

5

sought to promote fear in the community. They operated by claiming territory and having some members specialize in certain crimes, although members would also engage in other types of crimes. To expand their influence, they recruited members by throwing parties and flaunting money on social media after committing crimes, and they created fear in the community to avoid getting caught. Every person Officer Kim had spoken with in Nickerson Gardens knew who the Bounty Hunters were and those not affiliated with the gang were extremely afraid of them.

Officer Kim opined that Mixon and Harris were both Bounty Hunter gang members. For Mixon, she based her opinion on the facts that he self-identified as a gang member; he had gang tattoos; he had been seen in gang attire; he had been seen openly associating with other gang members; he had been identified as a gang member by informants; he had a gang moniker; and he had been stopped in an area controlled by the Bounty Hunter gang. She further opined Mixon's "B" and "H" chest tattoos stood for Bounty Hunters and his "Savage" tattoo on his arm signified the Savage Squad clique within the Bounty Hunters gang, whose common activities included face-to-face robberies using force and creating the possibility for injury. Officer Kim based her opinion of Harris's gang membership on similar facts: he self-identified as a gang member; he had gang tattoos; he had been arrested for crimes consistent with gang activity; he had been seen openly associating with other gang members; he had been seen in gang attire; and he had been seen flashing gang signs. Once when she stopped Harris, she saw a gang tattoo of "Get It Sq," which signified the Get It Squad, another clique within the Bounty Hunters gang known for narcotics sales and other crimes in which money was easily obtained. She opined members of different cliques intermingled and committed crimes together.

Given a hypothetical scenario tracking the facts of this case, Officer Kim opined the robbery was committed for the benefit of and in association with the Bounty Hunters criminal street gang. It benefitted the gang because a daytime robbery instilled fear in the community and enhanced the gang's reputation. It also produced money that could be used to buy narcotics, which could then be sold to purchase firearms, making the gang

6

look attractive for new recruits. And it enabled members not to work and instead congregate in public to further intimidate the community. The robbery was in association with the Bounty Hunters because two members committed the crime together. They would have been expected to back each other up even though they were members of different Bounty Hunter cliques.

Officer Kim also testified to crimes committed by other Bounty Hunter gang members. One was a 2011 conviction for robbery and the other was a 2013 conviction for attempted robbery.

A civil gang injunction was issued in 2003 against the Bounty Hunters gang, which created a safety zone that prohibited members from associating with each other; intimidating people; possessing weapons, guns, and narcotics; engaging in narcotics activity; gambling; and any criminal activity. Hawkins is located within the safety zone. Officer Jesus Garcia served Harris with the injunction in 2010. At the time, Harris said, "It's cool, Garcia."

Harris was convicted in 2010 for possession of a controlled substance for sale in violation of Health and Safety Code section 11351.

Mixon did not testify and presented no witnesses for his defense. Harris testified and denied committing the robbery, denied going to Hawkins on the day of the robbery, denied having a gun on the day of the robbery, and denied being a gang member. He also denied he was a violent person. On the day of the robbery, he was with his girlfriend Brown at her Nickerson Gardens apartment. The night before, he and Brown went to Long Beach to celebrate their anniversary and returned to Brown's apartment that night. He drank alcohol that evening and was ill the next day. Around noon, Brown left for 10 minutes to the nearby liquor store to get him a soda and Alka-Seltzer. Later, Harris went to the store himself for more soda, returned to the apartment, and did not leave the rest of the day.

When Harris was arrested in front of the recreation center in Nickerson Gardens, he cooperated with the police. People crowded around him and said the police were

7

trying to get him "for that stuff that happened at Hawkins," at which point he said something like, "Am I being arrested for a robbery[?]"

Harris denied he had ever been an active member of the Bounty Hunters gang. His tattoos referred to people who had died and showed he liked money. He denied ever self-identifying as a gang member. His nicknames were Little Derrick and Little Baby G, and he had never been known as Rondo.

He admitted his 2010 conviction for possession of narcotics for sale, but claimed he possessed "weed" just to smoke it, not sell it. He was unaware the conviction was for possession of cocaine or cocaine base for sale. He also admitted in 2007 he was arrested for possession of a firearm, which was handled in juvenile court. He was 16 years old at the time and had the gun for self-defense after being shot at in high school the day before.

Harris called several other witnesses for his defense. Brown corroborated his testimony about their trip to Long Beach, his illness on the day of the robbery, their separate trips to the liquor store, and that they did not leave the apartment the rest of the day. A short-order cook for Hawkins testified he had known Harris for 15 years and had not seen him at all on the day of the robbery, although in the 15 minutes prior to the robbery he could not see outside at all and did not see the robbery occur. Donny Joubert worked at Nickerson Gardens as a gardener, caretaker, and recreation assistant at the gymnasium, and worked on gang intervention and prevention. He testified he had known Harris since he was born and saw him every day for the last three years playing basketball for a team he manages. He knew Harris had a prior conviction for possession of a controlled substance for sale. He was present at Harris's arrest, and officers would not tell him why he was being arrested, but he did not hear the word "robbery." He was certain Harris did not commit the robbery and he would not have testified for Harris if he thought he was lying.

In Harris's defense case, Officer Kim testified she had never heard Harris referred to as Rondo. In rebuttal, she reiterated that Harris had admitted that he was a Bounty Hunters member and she identified him in a photograph of him throwing a Bounty Hunters gang sign with other Bounty Hunter members.

8

## 1. *Bifurcation of Gang Evidence*

Before trial, Mixon, joined by Harris, moved to bifurcate the "gang charge and enhancements" from the trial of the underlying robbery, arguing the evidence of Mixon's gang involvement was weak and the gang evidence was overly prejudicial. (Capitalization omitted.) At the hearing on the motion, Mixon argued that other than his "B" and "H" tattoos, there was no evidence of promotion of a gang in the case. Harris argued there was no evidence the robbery had any gang connection and the "real issue" was identification, so Harris would attempt to disassociate himself from Mixon. He pointed out that Mixon did not live in Nickerson Gardens and they were in different Bounty Hunters cliques. There were also 800 members in the Bounty Hunters gang, so their mere membership did not establish they knew each other. The prosecutor argued the gang evidence was relevant to motive and identity. It related to defendants' motive because Mixon displayed his "B" and "H" tattoos at the time of the robbery and was a member of the Savage Squad clique known for committing robberies. It related to identity because their gang association led Officer Kim to identifying them as suspects and there was evidence they were acquainted with each other, which could rebut defendants' argument they did not know each other.

The court denied the request to bifurcate, finding the gang evidence relevant to identity as follows:

"I'm candid with all of you. I didn't realize count 3 was the gang injunction or a gang injunction. Count 2 [felon in possession] would have made the decision a lot easier

---

**3** Recently, our Supreme Court has condemned the common practice of codefendants in a criminal appeal making "a blanket statement that he joins in the claims raised by each of the others, to the extent that the claims are not in some manner adverse to their own interest." (*People v. Bryant* (2014) 60 Cal.4th 335, 363.) In his opening brief filed after *Bryant*, Mixon makes that same blanket joinder statement. It has no impact here, however, because Mixon has separately argued the bifurcation issue, which is the only issue raised by Harris that might inure to Mixon's benefit.

9

because I think that is [*sic*] evidence of gang membership will be admitted notwithstanding the gang allegations in counts 1 through 4 [*sic*].

"However, just for the record, I do find that the evidence is probative of something other than the gang enhancement, and that is the identity of both defendants and their connection to each other.

"In that respect, I find the evidence of gang relationship is relevant irrespective [of] the [section] 186.22 allegations. I've also independently balanced the probative value versus the prejudicial impact, and I do not find that it's at the—that the prejudicial impact is substantially outweighed by the probative value.

"To put it another way, I find it to be probative and not particularly prejudicial vis-à-vis that probative value. It is evidence of identity. It is evidence of a connection between both defendants and again at least, with respect to defendant Harris, their gang evidence will be admitted pursuant to count 3.

"So the defendant's request to bifurcate the gang allegations as alleged in counts 1 through 4 [*sic*] is denied."

When a defendant is charged with gang enhancements, a trial court retains discretion to bifurcate those enhancements from a trial of the underlying offenses. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*).) Bifurcation may be warranted when the gang evidence supporting the enhancements does not relate to the defendant, or, even if it does, it is "so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (*Ibid.*) But even when a gang enhancement is not charged, "[e]vidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary." (*Id.* at pp. 1049-1050.) When a gang enhancement

10

is charged, however, the trial court enjoys broader discretion to deny bifurcation than when a gang enhancement is not charged.  (*Id.* at p. 1051.)  It is up to the defendant "'to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.'"  (*Ibid.*)

In *Hernandez*, for example, our Supreme Court found no abuse of discretion from the trial court's refusal to bifurcate gang enhancements from an underlying robbery because the gang evidence was relevant to the robbery itself.  The robbery was a coordinated effort by two gang members, during which one of the defendants identified himself as a gang member in an attempt to use his status to demand money from the victim.  A gang expert also testified to the significance of announcing their gang affiliation and the relationship between the different cliques they belonged to, which was relevant to motive, use of fear, and intent.  The court noted some of the expert testimony may not have been admissible at a trial limited to guilt, such as evidence that members of the same gang had been convicted of driving a vehicle without the owner's consent, but that evidence was not "particularly inflammatory.  Those convictions were offered to prove the charged gang enhancement, so no problem of confusion with collateral matters would arise, and they were not evidence of offenses for which a defendant might have escaped punishment.  Any evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of defendants' actual guilt." (*Hernandez, supra*, 33 Cal.4th at p. 1051.)

Because gang enhancements were charged in this case, the trial court's discretion to deny bifurcation was broad, and we find no abuse of that discretion.  The evidence of defendants' membership in the Bounty Hunters was the link in the chain of events leading to identifying them as perpetrators of the underlying robbery.  (See *People v. Williams* (1997) 16 Cal.4th 153, 193 [gang evidence relevant to prove identity and motive]; *People v. Champion* (1995) 9 Cal.4th 879, 922 [gang evidence relevant to prove identity].)  Blackwell saw a "B" and an "H" tattooed on one of the assailants, which Officer Kim knew stood for Bounty Hunters, which in turn led her to identifying

11

defendants. Detective Parker then placed their photographs in photographic lineups shown to Blackwell, who identified them without hesitation. Officer Kim also noted defendants had tattoos for their respective Savage Squad and Get It Squad cliques, and members of different cliques often intermingled and committed crimes together. That created a connection between Harris and Mixon, buttressed Blackwell's identification, and supported the prosecution's aiding and abetting theory. While not exactly like the evidence in *Hernandez*, in which the defendant called out his gang affiliation to intimidate the robbery victim, the gang evidence here was sufficiently critical to identifying defendants that bifurcation was not compelled.

Further, although some of the gang evidence would not have been admissible in a trial limited to the robbery count, the risk of prejudice from that evidence was low. Officer Kim testified to two predicate offenses of robbery by other gang members to support the gang enhancements. As in *Hernandez*, however, there was little risk of the jury becoming confused with collateral matters or of the jury punishing defendants for crimes for which they might have escaped punishment. Thus, "[a]ny evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of defendants' actual guilt." (*Hernandez, supra*, 33 Cal.4th at p. 1051.)

Harris advances several arguments, none of which changes our conclusion. First, he argues that the gang evidence was unnecessary to identify defendants as the perpetrators because Blackwell saw their faces at the scene. But at trial defendants attacked his identification, so the prosecutor was entitled to offer evidence of their gang affiliation to rebut their defense. Second, he claims the evidence of defendants' gang affiliation was cumulative of other evidence they were acquainted. That evidence was not particularly strong, so again, the prosecutor was permitted to offer gang evidence to show defendants' connection to one another. Third, Harris argues defendants' membership in the 800-member Bounty Hunters was not probative that they knew each other and would commit the robbery together. He ignores the evidence that defendants were, in fact, acquainted, so evidence of their joint gang membership was probative of

12

their joint commission of the robbery. Finally, given the gang evidence in this case was relevant to identifying defendants as the perpetrators, we reject Harris's contention the evidence merely established defendants had criminal dispositions.

The circumstances of this case differ from *People v. Cardenas* (1982) 31 Cal.3d 897 and *People v. Bojorquez* (2002) 104 Cal.App.4th 335, cited by defendants, because neither case involved gang enhancements and the gang evidence was not intertwined with the underlying crimes as it was here. (See *Cardenas, supra*, at pp. 904-905 [evidence of common gang membership was cumulative and unduly prejudicial when admitted to show bias of defense witnesses because ample other evidence showed witnesses and defendant were friends]; *Bojorquez, supra*, at pp. 343-345 [no error in admitting evidence of defendant's and defense witness's common gang membership for impeachment, but prejudicial error to admit general evidence of criminal activity of area gangs and of defendant's gang].) Mixon also cites *People v. Albarran* (2007) 149 Cal.App.4th 214, but in that case the court found the admission of gang evidence inflammatory and prejudicial because the trial court had dismissed the gang allegations following a new trial motion and the prosecution failed to present evidence the underlying crimes were gang-motivated, which is not an issue here. (*Id.* at pp. 227-228.)

In any case, even if the court improperly denied bifurcation, the error was harmless under either *Chapman v. California* (1967) 386 U.S. 18, 24 (harmless beyond a reasonable doubt) or *People v. Watson* (1956) 46 Cal.2d 818, 836 (reasonable probability of a more favorable outcome). The evidence of defendants' guilt was overwhelming. Identification, the primary issue at trial, was not a close question. Blackwell got a clear view of defendants when he casually spoke with them before the robbery, thereafter identifying them without hesitation in photographic lineups and again at trial. He also identified Mixon's "B" and "H" tattoos in a photograph shown to him *after* the photographic lineups, which would have been an extraordinary coincidence if Mixon was not one of the perpetrators of the robbery. Harris admitted he may have been at Hawkins at the time of the robbery and Mixon admitted he was there, but claimed others committed the robbery. Mixon's cell phone contained a text message from the day of the

13

robbery indicating he "just hit a lick," slang for committing a robbery. And Mixon admitted knowing Harris from around Nickerson Gardens. In closing arguments, the prosecutor only briefly mentioned the gang evidence in rebuttal as it related to the robbery. Thus, there is no reasonable probability the jury was influenced to find defendants guilty of robbery based on the gang evidence admitted at trial.

## 2. *Motion for Mistrial*

Before trial, the court granted Mixon's motion to bifurcate trial on the truth of his prior conviction for a 2012 residential burglary. During trial outside the presence of the jury, the court renewed that ruling. During cross-examination, Harris's counsel asked Officer Kim how many times she had seen Mixon around Nickerson Gardens before July 1, 2013. She responded, "I only saw him once, and it was just when he got out of prison." Mixon's counsel objected as "[b]eyond the scope." The court sustained the objection and struck everything after "once" in Officer Kim's response. Harris's counsel moved on with her questioning.

At the conclusion of the prosecution's case-in-chief, Mixon's counsel moved for a mistrial, arguing Mixon's prior conviction was "going to be off limits" and Officer Kim's response that he was just released from prison violated his due process rights. The court pointed out Mixon's counsel had objected and the court struck the response. Nevertheless, Mixon's counsel argued the jury still heard the comment and "[t]he cat[']s out of the bag." The prosecutor argued the comment was inadvertent and was simply Officer Kim's response to the question. The prosecutor suggested the court could give an instruction to disregard stricken testimony. The court denied the motion, reasoning that, while the jury heard the comment, the comment was not intentional and was "one very brief reference." The court would admonish the jury to disregard stricken evidence. After the close of evidence, the court indeed instructed the jury to disregard any stricken testimony.

"'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'" (*People v. Williams* (2006) 40 Cal.4th 287, 323.) "A trial court

14

should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court's ruling denying a mistrial." (*People v. Bolden* (2002) 29 Cal.4th 515, 555.)

Here, there was no such irreparable damage to Mixon's right to a fair trial. Officer Kim's unintentional reference to Mixon having gotten out of prison was exceedingly brief and the trial court immediately struck it. The jury was instructed not to consider stricken testimony, and we presume the jury followed that instruction. (*People v. Delgado* (1993) 5 Cal.4th 312, 331.) There is nothing in the record to suggest the jury considered Officer Kim's comment or Mixon's criminal history in convicting him of robbery. Because Officer Kim's comment was "not significant in the context of the entire guilt trial . . . the trial court did not abuse its discretion in ruling that defendant's chances of receiving a fair trial had not been irreparably damaged." (*People v. Bolden, supra*, 29 Cal.4th at p. 555.)

## 3. *Dual Use of Gang Conduct at Sentencing*

Harris asks us to strike the two-year gang enhancement for his violation of the gang injunction in count 3, arguing the trial court improperly relied on the same gang-related conduct to elevate the misdemeanor to a felony pursuant to section 186.22, subdivision (d) and to impose the gang enhancement pursuant to section 186.22, subdivision (b)(1). Somewhat confusingly, respondent concedes the court erred, but requests that we strike only the sentence on the enhancement but not the enhancement itself. We agree the trial court erred and conclude the enhancement must be stricken.

Section 186.22, subdivision (b)(1) imposes an additional prison term of two, three, or four years for felonies committed to benefit a criminal street gang. (§ 186.22, subd. (b)(1)(A).) The additional term is five years if the underlying crime is a serious felony (§ 186.22, subd. (b)(1)(B)), and 10 years if it is a violent felony (§ 186.22, subd. (b)(1)(C)). (*People v. Jones* (2009) 47 Cal.4th 566, 571.) Section 186.22, subdivision (d), in contrast, allows a trial court to impose felony punishment for a misdemeanor committed with a gang-related purpose. (*People v. Arroyas* (2002) 96 Cal.App.4th 1439, 1445 (*Arroyas*); see *People v. Ulloa* (2009) 175 Cal.App.4th 405, 411 (*Ulloa*).) Section

15

186.22, subdivision (d) states as relevant here: "Any person who is convicted of a public offense punishable as a felony or a misdemeanor, which is committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall be punished by imprisonment in a county jail not to exceed one year, or by imprisonment in a state prison for one, two, or three years."

As the parties correctly point out, a court may not impose both the penalty provision in section 186.22, subdivision (d) to punish a gang-related misdemeanor as a felony and impose a gang enhancement pursuant to section 186.22, subdivision (b)(1). (*Arroyas, supra*, 96 Cal.App.4th at p. 1449; see *People v. Briceno* (2004) 34 Cal.4th 451, 465; *Ulloa, supra*, 175 Cal.App.4th at p. 411.) But that rule does not apply here because it appears the trial court punished Harris's violation of the gang injunction as a misdemeanor, not a felony. At sentencing, Harris's counsel indicated the gang injunction count was a "six-month misdemeanor," and the court imposed "six months in any penal institution" for that count. That sentence had to be a misdemeanor because section 186.22, subdivision (d) provides for felony punishment of a minimum of one year in state prison. (See § 17, subd. (a) [felonies are crimes punishable by imprisonment in state prison].) The gang enhancement under section 186.22, subdivision (b)(1) only applies to felony convictions, so the trial court erred in imposing the enhancement on the misdemeanor sentence. (*Ulloa, supra*, at p. 411 ["Imposition of a sentence enhancement pursuant to section 186.22, subdivision (b)(1), will occur only when the underlying crime is a felony."].) Of course, even if the trial court elevated the gang injunction count from a misdemeanor to a felony, the enhancement under section 186.22, subdivision (b)(1) was unauthorized pursuant to *Arroyas* and *Ulloa*. Thus, in any scenario the trial court improperly imposed the enhancement under section 186.22, subdivision (b)(1) on the gang injunction count.[4]

---

[4] To confuse matters further, the information did not allege an enhancement pursuant to section 186.22, subdivision (b)(1) for the gang injunction count. The verdict

16

The question remains whether to strike the two-year enhancement and affirm Harris's sentence as modified, or remand for resentencing. Respondent suggests that remand may be appropriate because the trial court may have sentenced Harris differently had it understood the gang enhancement was unauthorized. She points out that, assuming the court intended to elevate the gang injunction violation from a misdemeanor to a felony, it could have imposed up to three years in state prison (§ 186.22, subd. (d)); it struck the section 186.22, subdivision (b)(1) gang enhancement for the robbery count for the purpose of sentencing; and it stayed the four-year gang enhancement for the felon in possession count.

We are not convinced the trial court would do anything differently on remand in light of our decision. First, the court did not contemplate sentencing Harris to anything other than a misdemeanor six-month sentence for the gang injunction count, regardless of the two-year gang enhancement, so there is little probability the court would elevate the misdemeanor to a felony in the absence of the gang enhancement. Second, the sentence on the gang injunction count was concurrent, so there would be no practical impact on the overall length of Harris's sentence even if the court elevated the misdemeanor to a felony. Third, the court's decisions on the other counts were not tied to Harris's sentence on the gang injunction count. The court struck the gang enhancement on the robbery count based on Harris's age, his lack of prior violence, and the court's view that 22 or 23 years in prison was too long in light of his criminal history. The court stayed the seven-year sentence on the felon-in-possession count (three years for the offense and four years for the gang enhancement) pursuant to section 654, which was based on the same facts underlying the robbery count, so the sentence on the gang injunction count would have

form listed the enhancement as falling within section 186.22, subdivision (b)(1)*(C)*, which imposes an additional 10 years if the underlying crime is a violent felony, while the trial court clearly treated the enhancement under section 186.22, subdivision (b)(1)*(A)*, which imposes an additional two, three, or four years. (The court also incorrectly labeled the low term of two years as the "midterm.") Harris does not raise any issue with these errors, so we need not address them. They are also moot given our conclusion the enhancement under section 186.22, subdivision (b)(1) must be stricken.

17

had no impact on that decision. In short, it is unlikely the court would impose a different sentence absent the two-year gang enhancement on the gang injunction count, so we will strike the unauthorized enhancement and affirm the sentence as modified, rather than remand for resentencing.

### 4. *Criminal Conviction Assessment Error in Harris's Abstract of Judgment*

We have identified an additional error in Harris's abstract of judgment: The trial court imposed a $30 conviction assessment pursuant to Government Code section 70373, but the $30 assessment applies to each count, so the correct fee is $90. (*People v. Sencion* (2012) 211 Cal.App.4th 480, 483-484.) The abstract of judgment must be corrected accordingly.

## DISPOSITION

The judgment as to Mixon is affirmed. We modify the judgment as to Harris to strike the section 186.22, subdivision (b)(1) enhancement for the gang injunction count and to impose a $90 criminal conviction assessment pursuant to Government Code section 70373. The trial court is directed to forward the corrected abstract of judgment to the Department of Corrections and Rehabilitation. So modified, the judgment as to Harris is affirmed.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

GRIMES, J.

18