Filed 6/29/16  In re Badillo CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re CHARLES MARCUS BADILLO <br><br> on Habeas Corpus. | G051994 <br><br> (Super. Ct. No. SWF10001582) <br><br> O P I N I O N |

Original proceedings; petition for a writ of habeas corpus to challenge an judgment of the Superior Court of Riverside County, Albert J. Wojcik, Judge.  Petition granted and case remanded.

Randi Covin, under appointment by the Court of Appeal, for Petitioner.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Marvin E. Mizell and Charles C. Ragland, Deputy Attorneys General, for Respondent.

\*          \*          \*

Charles Marcos Badillo seeks a writ of habeas corpus on grounds he received ineffective assistance of counsel (IAC) when his attorney failed to object at trial to an extraordinary volume of prejudicial gang evidence the prosecution introduced to support a hate-crime enhancement (Pen. Code, § 422.75, subd. (a); all further statutory references are to this code) on two counts of criminal threats (§ 422). Although the prosecutor did not charge Badillo with a gang offense or enhancement (§ 186.22, subds. (a) & (b)), the trial court admitted evidence of Badillo's gang affiliation, but only *if* it tended to show an alleged group animus towards African-Americans. (See *People v. Badillo* (G050742, Apr. 28, 2015) [nonpub. opn.].) In Badillo's direct appeal, however, we observed the prosecutor far exceeded the court's pretrial ruling contemplating the admission of gang evidence. "In fact," we noted, "this panel has seen less gang evidence in cases where the gang offense and enhancement are at issue." (*Id*. at p. 14.) But because the court's pretrial ruling was within its discretion at the time it was made, and counsel did not object to the prosecution's gang evidence at trial, nor did Badillo "argue on appeal his defense counsel was ineffective," we affirmed the judgment. (*Id.* at p. 15; accord, *id*. (Aronson, J., concurring) at p. 3 ["We cannot reach the issue of trial counsel's competence, however, because the matter was not raised on appeal"].)

Badillo now raises the issue, along with additional IAC claims for failure to object to a booking statement he allegedly made and for failure to object that his enhanced sentence of 46 years to life constituted cruel and unusual punishment. We grant Badillo's petition on the gang evidence issue, rendering his other claims moot.

I

FACTUAL AND PROCEDURAL BACKGROUND

The underlying incident arose in July 2010 in Hemet when Badillo's neighbor and former friend, Vernon Phillips, hired Ivory Russell to move Phillips's belongings. Russell is African-American, and Russell brought a friend, Christopher Kaiser, who is of mixed race, half African-American.

2

Phillips and Badillo lived across the street from each other and had been friends before they had a recent "falling out" because, according to Phillips, he gave Badillo's wife, Marlene Badillo, a ride when she and Badillo were separated. According to Marlene Badillo, Phillips told her she was too good for Badillo, she should leave him altogether, and he asked for a kiss. She claimed she did not tell Badillo about Phillips's overture until after Badillo was arrested because she did not want to ruin their friendship. It appears Badillo may have had his suspicions, but he claimed he was only angry briefly with Phillips because Phillips had been drinking when he gave his wife the ride.

In any event, several months earlier when Badillo had a better relationship with Phillips, he took Phillips to buy a rifle, which Phillips stored in his own garage. Phillips claimed the rifle belonged to Badillo and he only kept it in his garage for awhile because Marlene Badillo did not want guns around her children. Badillo discovered the gun in his backyard the morning before the incident, and he assumed Phillips had stashed it there.

According to Badillo, he was outside his home on Phillips's moving day when Russell began eyeing him in an aggressive manner. According to Russell, the encounter had racial overtones before Badillo even approached. Russell heard Badillo say to a couple walking nearby, in reference to Russell and Kaiser, "They're not supposed to be in this area" or something similar, along with a derogatory comment in a "belligerent" tone. Russell and Badillo stared at each other, and Badillo asked, "Why [are] you mad-dogging me?"

Russell thought he heard Badillo use the word "nigger," but acknowledged it could have been "What's up nigga," or just "nigga," which he considered less derogatory and in other circumstances might have made him laugh. Badillo claimed he said, "My nigga, my nigga, where's Bubba? What's happening? Where's Bubba," which was his nickname for Phillips. Badillo was hot in the 100 degree heat and upset that Russell and Kaiser had been yelling insults at him, but he wanted to return Phillips'

3

gun before Phillips moved because Badillo knew he was not supposed to possess a firearm.

According to Russell, the confrontation became expressly charged with racism when Badillo stated, "Yeah, we don't like your kind in this area." Russell responded, "Hey, man. I'm here to work. Do a job. It ain't got nothing to do with you." But he admitted he was angry and took a step toward Badillo, demanding, "Well, what do you want to do?" When Badillo also advanced, Kaiser heard Russell say something like, "Come on. Bring it."

Badillo retreated to his home, but then returned with a rifle, which Russell agreed he was only holding vertically, not pointing it at anyone. But Badillo and Russell were both still angry and hostile. At some point either before or after Badillo pointed the rifle at Russell — the evidence was conflicting as to when — Russell stated, "If you're going to shoot me, you might as well kill me. Because if I get my hands on you, I'm going to kill you." Badillo denied pointing the gun at Russell, who taunted him and also used the word "nigga," boasting, "Nigga, you better make it count [or] I'm gonna kill you." Russell and Kaiser heard Badillo threaten them, "I'll kill you, nigger" or "I'm going to kill you Niggas."

Kaiser fled into Phillips' house to call 911, and urged Russell to follow him, but according to Kaiser, Russell stood firm "with his chest poked out," arguing with Badillo. Badillo pointed the rifle at Russell's chest for five to eight seconds, then lowered it, and walked back inside his house. He reappeared with his children, and as they entered his car, the police arrived and arrested him.

The prosecutor charged Badillo with one count each of making of making a criminal threat against Russell and Kaiser, with a hate-crime enhancement based on Badillo's alleged racial animus, and also charged Badillo with prohibited possession by a felon of a firearm and ammunition. Badillo and several witnesses testified in his defense, including the couple who had been walking nearby when the confrontation erupted. The

4

jury deadlocked on all counts: four jurors voted to acquit Badillo on the threat counts, and eight to convict; nine to convict on the firearm possession count, and 11 to acquit on possessing ammunition. The prosecutor had introduced some gang evidence, but it was limited in scope, consisting primarily of a gang expert's testimony spanning 22 pages in the trial transcript.

At defendant's second trial on the same charges, the prosecutor in a pretrial motion sought permission to introduce gang evidence again because it had been admitted in the first trial and Badillo's affiliation with the "Pico Rivera 13" criminal street gang was relevant to prove the hate-crime allegation. Defense counsel objected because although Badillo had associated with a gang when he lived in Pico Rivera, he had moved away when he was a teenager. Now in his thirties, Badillo lived in Hemet and his street where the altercation occurred was more than 80 miles from Pico Rivera. He objected that the gang evidence would inflame the jury against him in a case involving no gang offense or enhancements.

The trial court granted the prosecutor's pretrial motion, but with the proviso that gang evidence was irrelevant absent a connection to alleged racial bias in the Pico Rivera 13 (Rivera or Rivera 13) criminal street gang. The court explained at the hearing: "*If* the expert were to testify that they do have certain attitudes, opinions toward blacks, *if* they have committed crimes against blacks, *if* they have been involved in what might be considered hate crimes, that's one thing. If that testimony is not forthcoming, then the gang affiliation, I think, would be irrelevant." (Italics added.) Addressing the prosecutor, the court continued, "But I am assuming, I am guessing they are going to testify about some opinions, attitudes, actions toward members of races other than those who belong to the gang and probably blacks; is that correct?" The prosecutor answered affirmatively.

On that basis, the trial court concluded gang evidence would be relevant and more probative than prejudicial, to the extent it showed racial animus. But the court cautioned that "there has to be some foundation laid regarding the crimes that the gang

has been involved with — there have to be some limits on that. And regarding hate type crimes I would allow more evidence regarding that because that's important in this case." In contrast, the court observed, "I don't know if there are any predicate crimes or anything. Because it's not a gang case." The prosecutor and defense counsel stipulated Rivera 13 was "a documented and active criminal street gang." The prosecutor offered the stipulation so her expert "doesn't hav[e] to go into the history of the gang and prove up prior predicate acts," other than evidence to support the hate-crime allegation.

At trial, the prosecutor introduced the testimony of four of the Hemet police officers who responded to the incident, spanning a few pages each in the transcript, and extensive testimony of five officers on gang issues, including one who had not testified in the first trial, and a new gang expert. The defense had not called a gang expert to testify in the first trial, but did so in the second trial to rebut the prosecutor's increased focus on gangs. Not including the testimony of the defense expert, the volume of gang evidence in the second trial more than doubled. Defense counsel did not object before, during, or after the testimony of any of the gang witnesses. Counsel noted the breadth of the gang evidence in his closing remarks to the jury by estimating that "80 percent of the evidence that was put on in this case was gang evidence," but again made no objection nor otherwise called on the trial court to exclude the evidence.

As summarized in our opinion in the direct appeal, Officer Kevin Lloyd testified as the prosecution's gang expert: "After detailing his background, training, and experience, Lloyd testified concerning primarily criminal street gangs in Pico Rivera, including Rivera 13, one of four major gangs in Pico Rivera. Lloyd testified concerning the culture and habits of criminal street gangs, including how someone joins a gang, the importance of respect, and the significance of gang tattoos. Lloyd said Rivera was a southern Hispanic gang that was loyal to the Mexican Mafia and was called 'Rivera 13,' 'Rivera Trece,' 'Viejo Rivera,' 'Viejas,' 'R13,' 'RV'" or 'Rivera Trece Parkside.' He testified at length concerning the Hispanic gang hierarchy from Rivera, [up] to Surenos,

6

who are southern gang members, [up] to the Mexican Mafia. He analogized the gang hierarchy to sports and said Rivera was high school level, Surenos college level, and Mexican Mafia professional level. He said Surenos have 'Sureno' and 'Southside' tattoos and Mexican Mafia have 'black hand,' 'E,' 'M–A,' 'red lipstick kiss,' which represents the number '13, and '13' tattoos. He said the number '13' is significant because it represents 'M,' the 13th letter of the alphabet.

"Lloyd stated Rivera 13's primary activities were vandalism, possession of weapons, narcotics sales, and assaults from beatings to murder. Lloyd said there were not many racially motivated crimes in Pico Rivera because the city was predominantly Hispanic, but there were racially motivated crimes in jail involving Rivera 13 against African-Americans even though they are segregated. He added Rivera 13 gang members have disdain for African-Americans and any disrespect has to be met with violence. He stated Rivera 13 gang members are almost always armed and they use weapons to sell narcotics, the proceeds of which they send to the Mexican Mafia. The parties stipulated 'Pico Rivera 13,' also known as 'Rivera 13' or 'R13,' is an active criminal street gang in Los Angeles County.

"Lloyd said it was common for Rivera 13 gang members to move from Pico Rivera and still be a part of the gang because if you rise to the level of a Sureno, you are respected throughout Southern California. He said to leave the gang you have to remove the gang tattoos. Lloyd opined Badillo was an active member of Rivera 13 based on his review of his criminal history, prior law enforcement contacts, tattoos, police reports, corrections records, and jail telephone calls. He added Badillo was a 'hardcore Sureno' and 'a more violent gang member predator.'

"Lloyd testified concerning the significance of Badillo's tattoos, including numerous Rivera tattoos. He stated the '13' on his neck indicates he is a Sureno and a Mexican Mafia member and '310' was the area code for Pico Rivera. He said 'rock and roll gangster' means Badillo is proud to be a gangster and 'R' on his face means he is

7

proud to be from Pico Rivera. He explained the clown on his shoulder has the following meanings: his gang moniker, 'Payaso,' which is Spanish for 'clown'; and it demonstrates he chose a gangster lifestyle and is prepared to accept the eventual consequences—prison or death. Lloyd said 'Sureno' over his eye is 'just so there is no doubt that he's a member of the Sureno or the Southern Hispanic gang' and 'SE' on the top of his head means he has graduated from Rivera to all of southeast Los Angeles; he said facial tattoos indicate an intent to appear menacing. He said 'I rather fuck you' on his forehead is derogatory to women, consistent with Rivera 13's male domination. According to Lloyd, 'You can't get to the level of a Sureno with respect with these tattoos . . . unless you have committed violence, done prison terms.' Based on hypothetical questions mirroring the facts of the case, Lloyd opined the hypothetical defendant's conduct was consistent with that of a Rivera 13 gang member.

"On cross-examination, Lloyd stated a Rivera 13 gang member could have a Caucasian friend or an African–American girlfriend but the gang member could not take the girlfriend to a Rivera 13 party. He added there was one African–American Rivera 13 gang member. The trial court instructed the jury on the limited purpose of the gang testimony after each of the officers testified." (*Badillo*, *supra*, at pp. 6-8.)

Badillo testified, denied he was a racist, and claimed Russell was the aggressor in their altercation. Addressing all the gang evidence, he admitted his family history as the youngest of seven boys who all belonged to Rivera 13. He had dropped out of school in ninth grade and became addicted to heroin, which led to his prior offenses, but these were not gang-related. He claimed he had left his gang participation days behind as a teenager and did not "gang bang[]" in Hemet, and that since his release from prison in 2009, he had maintained steady employment and treatment for his drug addiction.

As recounted in our prior opinion, Badillo "also denied telling the deputy in jail he 'does not like blacks or whites.' Badillo said he told the deputy he 'house[s] with

8

southern Mexicans' and 'cannot house with blacks or whites[]' for his safety and others pursuant to jail rules. Badillo denied he participated in [a] riot in Pelican Bay prison, denying it was a race riot." (*Badillo*, *supra*, at p. 10.)

Elton Johnson, an African-American, testified he knew Badillo from church, had been friends with him and his family for 20 years, socialized with him, and never knew him to be a racist or to make racist comments, and Badillo's wife similarly testified. Phillips testified he and Badillo both sometimes engaged in making racial jokes about "everyone," including whites and blacks, but harbored no hatred or racism.

The couple who had witnessed at least some of the altercation again testified as defense witnesses. Some of their testimony and prior statements supported Badillo's version of events, and some supported Russell's.

The parties stipulated that in August 2004 Badillo was convicted of damaging or destroying a telephone line, a felony under section 591, and he was prohibited from possessing a firearm or ammunition. Badillo argued he fell within a statutory exemption because he discovered the weapon in his yard and it would have taken him less time to return it to Padilla than to law enforcement (see §§ 29850, 30305 [providing for justifiable possession of a firearm or ammunition by a felon or other prohibited persons in certain circumstances]), until Russell threatened to kill *him* with the gun.

The trial court instructed the jury with CALJIC No. 17.24.3, as follows: "Evidence has been introduced for the purpose of showing criminal street gang activities, and of criminal acts by gang members, other than the crimes for which defendant is on trial. [¶] This evidence, if believed, may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining whether the offenses set forth in Counts 1 & 2 were motivated by Defendant's bias. [¶] For the limited purpose for which you may consider this evidence, you must weigh it in the same

9

manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

The second jury again was unable to reach a verdict on the criminal threat count involving Kaiser or the hate crime allegation on the threat against Russell. This time, however, the jury convicted Badillo of threatening Russell, found true the allegation he personally used a firearm in doing so (§§ 12022.5, subd. (a), 1192.7, subd. (c)(8)), and convicted him of the firearm and ammunition possession counts.

The trial court sentenced Badillo to a determinate term of 21 years, consisting of the upper term of six years on the firearm possession count, the middle term of four years on the firearm use enhancement, two five-year prison terms on prior serious felony conviction enhancements (§ 667, subd. (a)) that the court found true in a bifurcated proceeding, and a one-year term on a prior prison term enhancement (§ 667.5, subd. (b)) the court also found true. The court sentenced Badillo under the Three Strikes Law to an indeterminate term of 25 years to life on the threat conviction, and entered a stay under section 654 on the ammunition count.

In Badillo's direct appeal, the panel concluded, "Although we are troubled by the volume of gang evidence admitted at trial, we conclude the court did not err." (*Badillo*, *supra*, at p. 2.) Our opinion explained that, under *People v. Lindberg* (2008) 45 Cal.4th 1, 6, "gang evidence, including expert testimony, may be admissible, even when gang offenses and enhancements are not charged, if the gang evidence is relevant to an issue in the case. Here, the prosecutor alleged Badillo made criminal threats because of Russell's and Kaiser's race (§ 422.75, subd. (a)). Thus, any gang evidence that tended to prove the hate crime allegations was relevant. In other words, evidence Rivera 13 gang members harbor ill feelings towards African-Americans and Badillo was a Rivera 13 gang member would be relevant because it would tend to establish Badillo harbored ill feelings toward African-Americans and he made the criminal threats against Russell and Kaiser because they were African-American." (*Badillo*, at pp. 13-14.)

10

While the trial court conditioned admission of gang evidence on its linkage, if any, to Rivera 13's alleged group bias, "the gang evidence went beyond that here," *but* "defense counsel never objected to the prosecutor's questions as violating the court's pretrial ruling." (*Badillo*, *supra*, at pp. 14-15.) Consequently, as the concurring opinion explained, no reversible error could be traced to the trial court because its rulings are evaluated at the time they are made, and absent an objection when "'the evidence is actually offered, and the court is aware of its relevance in context, its probative value, and its potential for prejudice . . . , the court cannot intelligently rule on admissibility.' Badillo's defense lawyer therefore had the responsibility to object if the prosecutor failed to provide a proper foundation for the gang evidence." (*Id.*, at conc., p. 2.) The panel agreed that Badillo's remedy, if any, lay in a habeas petition. (*Id.* at p. 3; accord, *id.* at p. 15 [observing that Badillo did not raise IAC in his direct appeal, "[p]erhaps . . . because [such] a claim . . . """is more appropriately raised in a petition for writ of habeas corpus"""].)

II

DISCUSSION

Badillo now asserts his trial attorney rendered ineffective assistance of counsel by failing to object to the mountain of gang evidence admitted without any connection to Rivera 13's or Badillo's alleged racial animus. We agree. In *People v. Albarran* (2007) 149 Cal.App.4th 214, 232, the court observed in reversing a murder conviction where the evidence did not support the alleged gang enhancement, "Given the nature and amount of this gang evidence at issue, the number of witnesses who testified to Albarran's gang affiliations and the role the gang evidence played in the prosecutor's argument," the court could not conclude the gang evidence "did not contribute to the verdict." Here, the sheer volume of gang evidence in this nongang case is staggering, and its prejudicial effect requires granting Badillo's petition for habeas relief and an untainted new trial.

11

The standard of review for an IAC claim is well settled. To prevail, a defendant must show that counsel's performance fell below prevailing professional standards and was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-694 (*Strickland*).) To prove prejudice, the defendant must demonstrate a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.) "'"A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]"'" (*People v. Weaver* (2001) 26 Cal.4th 876, 925.)

There is no question *Strickland*'s first prong is satisfied here. Trial counsel has filed an affidavit in support of Badillo's habeas petition explaining he assumed his pretrial objection was sufficient, but as we explained in the direct appeal, that is not the case, and counsel now acknowledges as much. Simply put, "[a] tentative pretrial evidentiary ruling, made without fully knowing what the trial evidence would show, will not preserve the issue for appeal if the appellant could have, but did not, renew the objection or offer of proof and press for a final ruling in the changed context of the trial evidence itself. [Citations.]" (*People v. Holloway* (2004) 33 Cal.4th 96, 133.) "One of the principal tasks of a defense attorney is to attempt to protect his or her client from the admission of evidence that is more prejudicial than probative" (*In re Jones* (1996) 13 Cal.4th 552, 581), and by failing to object to the prosecutor's relentless stream of gang evidence untethered to racial animus, counsel's performance did not meet the required standard here.

The Attorney General does not dispute that trial counsel's performance was deficient, arguing only that Badillo has not shown prejudice "for four reasons." First, as between the evidence that supported Russell's version of events and the evidence supporting Badillo's claim Russell was the aggressor, the Attorney General merely asserts the former was more credible. But that begs the question of whether the plethora

of gang evidence that would not have been admitted if counsel had objected unfairly undermined Badillo's credibility. We conclude it did.

Badillo denied pointing the rifle at Russell, but he also emphasized Russell was the aggressor. While the evidence was conflicting, it was consistent with his belief *Russell* intended to seize the gun and shoot *him* when Badillo had not been pointing it at anyone. As the concurring opinion on appeal observed, the improper gang evidence had "disastrous consequences" for Badillo's defense. (*Supra*, at p. 2.) "It seems probable the inflammatory gang evidence influenced the jury to reject his testimony. The jury likely concluded that Badillo was the kind of person who would threaten [Russell] with a gun because he belonged to a gang that had committed at least 20 murders, maintained ties to the Mexican Mafia, and its members, including Badillo, commonly carried guns to support their criminal endeavors. Indeed, it is doubtful a jury would believe anyone who fit this profile." (*Ibid.*)

Second, while the Attorney General concedes Badillo's credibility was "crucial to his defense, his credibility was severely undermined even without the additional gang evidence." The Attorney General points to the evidence "that petitioner was a Rivera 13 gang member and that Rivera 13 and petitioner personally harbored racial animus toward African-Americans." But that evidence was conflicting and slight in comparison to the deluge of improper gang evidence with no relation to racial animus. For example, the prosecution's evidence showing Rivera 13's racial antagonism toward African-Americans only occurred in a custodial setting. Lloyd admitted his opinion that Rivera 13 gang members "disdain" African-Americans was based on his experience "mostly in the jail," but as we observed in the direct appeal, "Needless to say, the incident here did not occur while Badillo was in custody, and a person's institutional behavior is not necessarily predictive of how that person will act while out of custody." (*Badillo*, *supra*, at p. 14.) But defense counsel did not object to any of Lloyd's testimony.

13

The Attorney General also points to Badillo's admission he had been to prison four times, including for assault with a deadly weapon and robbery, and also derides as "implausible" Badillo's claim he wanted to return Phillips's rifle. But many of the witnesses had felony convictions, including Kaiser, who testified both to Badillo's racial animus and to Russell's aggressive conduct. The wife in the husband-and-wife couple who were walking nearby during the altercation expressly recalled she heard Badillo state he was returning Phillips' gun, while her husband's statements were equivocal on whether Badillo pointed the gun at Russell. Badillo's felony record was introduced in the first trial as well, but that jury hung. The scope of the gang evidence marked the only significant difference between the two trials. It was the jury's prerogative to credit witness testimony, in whole or in part. Consequently, the impact of the improper gang evidence on Badillo's credibility cannot be overstated.

Third, the Attorney General argues that while the jury asked several questions during deliberations and had the testimony of several witnesses read back, none involved the gang evidence. The Attorney General deduces from this and from the jury's verdict acquitting Badillo of the threat against Kaiser and the hate-crime allegation that the jury discharged its duties carefully and was not influenced by irrelevant or excessive gang evidence. But the jury asked six questions in the first trial and four in the second, and in both requested readbacks of the testimony about the confrontation, demonstrating the case was a close one.

If the jury had quickly returned guilty verdicts, the Attorney General would argue it showed the evidence was so overwhelming there could be no conceivable prejudice. Her argument here that protracted deliberations resulting in a partial acquittal showed only a thoughtful jury unswayed by prejudice is appealing in theory, but merely speculative. The Attorney General points to nothing in the second trial that was absent in the first trial to explain the different verdicts. We find it compelling that the jury hung in the first trial without the superfluous gang evidence; indeed, a full third of the jurors

14

believed Badillo was entitled to acquittal on the threat counts. These circumstances undermine our confidence in the jury's second verdict. There is a reasonable probability counsel's failure to object to the irrelevant gang evidence explains the divergent outcomes, to Badillo's detriment, and no more is required. (*Strickland*, *supra*, 466 U.S. at p. 684.)

Finally, the Attorney General relies on the trial court's limiting instructions. Ordinarily, we presume the jury heeds the trial court's directions, particularly instructions limiting its consideration of evidence. (*People v. Avila* (2006) 38 Cal.4th 491, 574.) But an overwhelming volume of improper evidence may outweigh the trial court's best intentions (*Albarran*, *supra*, 149 Cal.App.4th at pp. 226-228), and our courts have long recognized the particularly volatile nature of gang evidence. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*); *People v. Gurule* (2002) 28 Cal.4th 557, 653; *People v. Cardenas* (1982) 31 Cal.3d 897, 904-905 (*Cardenas*); *People v. Avitia* (2005) 127 Cal.App.4th 185, 193; *People v. Bojorquez* (2002) 104 Cal.App.4th 335, 342.)

In *Cardenas*, for example, the Supreme Court observed in reversing the defendant's attempted murder conviction that the "error in admitting the evidence of common membership in the Flores gang was compounded by the prosecutor's broad inquiries suggesting that the gang was involved in [unrelated] criminal activities. These questions made it a near certainty that the jury viewed appellant as more likely to have committed the violent offenses charged against him because of his membership in the Flores gang." (*Cardenas*, *supra*, 31 Cal.3d at p. 906.) Accordingly, "[i]n cases *not* involving the gang enhancement," the high court has held that gang evidence "is potentially prejudicial and should not be admitted if its probative value is minimal." (*Hernandez*, *supra*, 33 Cal.4th at p. 1049.)

*Albarran* is instructive. There, the trial court granted a new trial motion concluding there was insufficient evidence to support the gang enhancement, but ruled some gang evidence was relevant to prove motive or intent for the substantive counts,

15

which included attempted murder, shooting at an inhabited dwelling and attempted kidnapping for carjacking. On appeal, the reviewing court held that even if some gang evidence were relevant on these issues, the lower court erred in admitting other extremely inflammatory evidence—including references to the Mexican Mafia, threats to kill police officers, and descriptions of criminal activities by other gang members—that had no connection to the underlying charges. (*Albarran*, *supra*, 149 Cal.App.4th at pp. 226-228.) Under the circumstances, rather than showing motive and intent, the gang evidence served only to inflame the jury and show defendant's dangerous and criminal disposition. (*Id.* at p. 230.)

Similarly here, the jury heard a great deal of prejudicial gang evidence, including as in *Albarran* irrelevant and ominous references to the Mexican Mafia and unrelated criminal offenses. The prosecutor introduced gang expert testimony on a full score of gang murders and assaults, delving into Rivera 13's asserted gang history in which its members were "almost always armed," and declaring, "Almost every Rivera Southern Hispanic will have done violence." None of this extremely prejudicial gang evidence had any connection to the issue of racial animus, which the court required in its pretrial ruling.

The Supreme Court has cautioned that gang evidence must be scrutinized even when it is relevant, due to its potentially inflammatory impact. (*People v. Carter* (2003) 30 Cal.4th 1166, 1194.) That did not occur here because counsel failed to object despite the trial court's pretrial foundation requirement indicating it "would have excluded most, if not all, the gang evidence that shed no light on whether the Pico Rivera 13 gang harbored racial animus toward African-Americans or committed hate crimes against them." (*Badillo*, *supra*, conc. at p. 2.) Because the vast majority of the prosecutor's gang evidence had no "bearing on whether Badillo or his gang harbored racial animus" (*ibid.*), Badillo has established the requisite prejudice for his IAC claim and a new trial without the improper evidence.

16

## III

## DISPOSITION

Badillo's habeas corpus petition is granted.  Let a peremptory writ issue directing the trial court to vacate Badillo's conviction and sentence, and the matter is remanded to the trial court for further proceedings.


ARONSON, ACTING P. J.

WE CONCUR:


IKOLA, J.


THOMPSON, J.

17